[No. S035348. Feb. 5, 2007.]

THE PEOPLE, Plaintiff and Respondent, v.
ROBERT LEE SMITH, Defendant and Appellant.

488

## COUNSEL

Scott F. Kauffman, under appointment by the Supreme Court, for Defendant and Appellant.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Gerald A. Engler, Assistant Attorney General, Ronald S. Matthias and Dorian Jung, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**MORENO, J.**—A jury convicted defendant Robert Lee Smith of the first degree murders of Michelle Dorsey and James Martin (Pen. Code, § 187), among other offenses, and found true the special circumstance allegations that defendant committed multiple murders (Pen. Code, § 190.2, subd. (a)(3)) and that each murder was committed during the commission of a robbery (Pen. Code, §§ 190.2, subd. (a)(17)(A), 211). Following a sanity phase held pursuant to defendant's plea of not guilty by reason of insanity, the jury returned a verdict that defendant was sane at the time of the offenses. After the penalty phase of the trial, the jury returned a verdict of death. This appeal

is automatic. (Pen. Code, § 1239, subd. (b).) As explained below, we will reverse defendant's conviction for receiving stolen property (Pen. Code, § 496, former subd. (1), now subd. (a)) and otherwise affirm the judgment.

## I. STATEMENT OF FACTS

### A. *Procedural History*

On June 18, 1991, the Contra Costa County District Attorney filed a 10-count information in Contra Costa County Superior Court, charging defendant with the following: two counts of first degree murder (of Michelle Dorsey and James Martin) in violation of Penal Code section 187; attempted robbery in violation of Penal Code sections 211, 212.5, subdivision (a), and 664; robbery in violation of Penal Code sections 211 and 212.5, subdivision (a); unlawful taking of a vehicle in violation of Vehicle Code section 10851, subdivision (a); first degree burglary in violation of Penal Code sections 459 and 460, former subdivision 1, now subdivision (a); possession of a controlled substance in violation of Health and Safety Code section 11350; receiving stolen property in violation of Penal Code section 496, former subdivision (1), now subdivision (a); petty theft in violation of Penal Code sections 484 and 488; and conspiracy to commit murder in violation of Penal Code section 182.

The information further alleged that defendant personally used a firearm in violation of Penal Code section 12022.5, subdivision (a),[1] in connection with the charge of receiving stolen property. Additionally, the information alleged as special circumstances that defendant committed multiple first degree murders under section 190.2, subdivision (a)(3), and that defendant committed murder in the course of a robbery under section 190.2, subdivision (a)(17)(A).

On July 8, 1991, defendant pled not guilty to all counts of the information and denied the special circumstance and firearm-use allegations. Subsequently, defendant filed a motion to set aside the information pursuant to section 995 and a nonstatutory motion to dismiss. The trial court dismissed the count alleging that defendant had committed petty theft and denied the remainder of defendant's motion to dismiss the information. The trial court also denied defendant's motion to sever the burglary and conspiracy counts.

On March 25, 1993, defendant entered a plea of not guilty by reason of insanity to all counts and allegations of the information, pursuant to section 1026. The guilt phase jury trial commenced on April 20, 1993. On May 27,

---

[1] All further undesignated statutory references are to the Penal Code.

1993, the jury convicted defendant of all remaining counts and found true the weapon allegation and all special circumstance allegations.

The sanity trial commenced on June 8, 1993. On June 22, 1993, the jury found that defendant was legally sane at the time of the charged offenses. The penalty phase began on June 23, 1993. On July 6, 1993, the jury determined the death penalty should be imposed. The trial court sentenced defendant to death for the murders and to an indeterminate term of 25 years to life on the conspiracy charge. In addition, the trial court imposed a determinate term of three years for the remaining counts, to be served concurrently with the indeterminate term. Pursuant to section 654, the court stayed the imposition of sentence on the above counts, pending the automatic appeal and the death sentence being carried out.

On September 30, 1993, the trial court denied defendant's automatic application to modify the death verdict. After considering defendant's motion for a new trial, the trial court dismissed the firearm enhancement allegation due to insufficient evidence, but otherwise denied defendant's motion. This appeal is automatic.

### B. *Guilt Phase Evidence*

### 1. *Prosecution Evidence*

Michelle Dorsey lived with her brother, James Martin, in a two-bedroom apartment in Richmond.[2] Joseph A. had known the victims since he was about five years old, visiting them several times a month, and had considered Dorsey his godmother. Defendant's brother, Jesse Smith, told the police that defendant and Dorsey had a "boyfriend, girlfriend type of relationship" and that Dorsey was defendant's ex-girlfriend.

Joseph, who was 14 years old at the time, went to visit Dorsey on the day of the murders, March 23, 1991. He found Dorsey in her bedroom, with defendant sitting at the foot of her bed. They were watching television, and Joseph joined them. After some time, defendant called Joseph to the living room and showed him a pistol and ammunition clip he had taken from Dorsey's dresser. At this time, Joseph thought that Dorsey probably was asleep. Defendant asked whether Joseph had ever considered robbing Dorsey and Martin, and Joseph replied that he had not. Nonetheless, Joseph took the pistol from defendant, loaded bullets into the clip, and handed the pistol back to defendant. Joseph believed that defendant would return the gun to the dresser.

---

[2] Michelle Dorsey was a biological male who dressed and lived as a female. In this opinion, we will refer to Dorsey as a female.

Joseph followed defendant to Dorsey's bedroom. Defendant asked Dorsey for the combination to the safe she kept in her bedroom. Dorsey noticed defendant holding the gun and demanded that he give the gun back to her. When Dorsey rose to confront defendant, he shot her once in the chest. Dorsey fell to her knees on her bed.

The shot woke Martin, who called out from his room to find out what was happening. Defendant told Martin to go back to sleep. Defendant and Joseph walked to the doorway of Martin's room, and, according to Joseph, defendant shot Martin once in the chest. At defendant's direction, Joseph carried Martin into the hallway. While Martin lay on the floor, still alive, defendant took money out of Martin's wallet. He then told Joseph to take Martin to Dorsey's room, where defendant and Joseph bound Martin's hands and feet.

With Joseph's assistance, defendant pulled Dorsey's safe out of the closet and took it downstairs to the trunk of Dorsey's car. They drove to Jesse Smith's house, where defendant rushed in and told Jesse that he "just shot two people." Jesse asked who defendant had shot, and defendant replied that it was Dorsey and her brother. Once they were able to pry the safe open, Joseph and defendant took the safe's contents; defendant took $100 cash, and Joseph took the rest of the cash and the jewelry. Joseph gave his girlfriend, Jalicia P., some gold bracelets from the safe.

Concerned that Martin had survived and could identify them, defendant and Joseph returned to the apartment to see if Martin was still alive. After confirming that Martin was dead, defendant and Joseph took some compact discs, tapes, and other small items from the apartment. Joseph and defendant returned to Jesse's house and disposed of the safe in the vacant lot next door.

The next day, the victims' sister, Wilma Thomas, found their bodies in the Richmond apartment. The apartment was ransacked, and Dorsey's car was missing.

Dorsey and Martin had each been shot one time. During the autopsy, the forensic pathologist found a .32-caliber bullet in Dorsey's body. Martin's hands and feet had been bound behind him with telephone cord and a leather belt. In Martin's bedroom, police found two unexpended .32-caliber rounds, and near Martin's bed there was one expended .32-caliber cartridge and some blood. Martin could have survived his wound if he had received immediate medical treatment, and it was estimated that it took him between 20 minutes and an hour to die from the wound.

The following day, defendant's brother, Jesse Smith, was driving Dorsey's car in North Richmond. Defendant was in the front passenger seat, and there

were two passengers, Darrell Fuller and Bobby Robinson, in the rear seat of the car. Defendant had told Jesse that he had he gotten the car from "some base head," had told Fuller that he had purchased the car from "faggot Michelle" for $4,000, and had gotten the gun from "some base head."

A deputy from the Contra Costa Sheriff's Office on patrol in North Richmond spotted Dorsey's car and pulled over the vehicle. As the car was pulled over, defendant told the other occupants to tell the deputy that the car was a friend's car or had been rented from someone. While searching the car, the deputy found a box of .32-caliber ammunition and a .32-caliber semiautomatic pistol underneath defendant's seat. The gun found in the car was registered to Dorsey, and analysis of an expended .32-caliber cartridge from the crime scene revealed that it had been fired from Dorsey's gun. Defendant was arrested.

Defendant was first interviewed by police on the day he was arrested, Monday, March 25, 1991. Defendant told inconsistent stories about how he had obtained Dorsey's gun; he told police that he had purchased Dorsey's gun from a person named "Skin," then told police that he actually had bought the gun from a drug dealer called "D Money." He told police that he had been approached by three men who drove up in Dorsey's car and asked for his help in opening the safe they had with them.

Eventually, defendant admitted that he had been at Dorsey and Martin's apartment when they were killed. He told police that he was at the apartment when Joseph and two other men arrived. He said that Joseph went into Dorsey's bedroom, that Dorsey told Joseph to put the gun down, and that he saw Joseph shoot Dorsey, then Martin. Defendant denied that he provided any assistance to Joseph or the other men in committing the murders, but admitted helping the men carry the safe to Dorsey's car and taking some money and other small items. Nearly 11 hours later, after interviewing Joseph, police reinterviewed defendant about the murders. Defendant admitted that he and Joseph had planned to rob Dorsey and that they were the only ones in the house,[3] but continued to deny having shot Dorsey and Martin.

## 2. *Defense Evidence*

During his opening argument, defense counsel focused his case upon the theory that Joseph, not defendant, shot Dorsey and Martin.

Peter Barnett, an expert criminalist and crime scene reconstructionist, testified that certain evidence at the crime scene contradicted the account of

---

[3] It is evident from the transcript of the interview that defendant meant that he and Joseph were the only ones in the house other than the victims.

the shootings presented by the prosecution. Barnett concluded that the shooter had been inside Martin's bedroom or the doorway to the bedroom when Martin was killed, instead of in the hallway, as posited by the prosecution. Additionally, Barnett concluded that it was unlikely that Michelle Dorsey had been on her knees facing the shooter eye-to-eye when she was shot, as the shooter would not have been able to shoot Dorsey with a straight shot from this position. Joseph had previously testified that Dorsey had been on her knees, facing towards defendant when she was shot.

Jalicia P., who previously had testified for the prosecution, testified that Joseph had given her some jewelry, and that he had appeared to be nervous when he presented the jewelry to her. She further testified that Joseph more recently had written her a letter in which he had threatened to kill her.

### C. Sanity Phase Evidence

#### 1. Defense Evidence

At the sanity phase, the defense first presented testimony about defendant's childhood and his behavior shortly before the murders.

Defendant acted differently from other children, including his siblings, beginning at the age of four years. Defendant's father, Robert Smith, Sr., was abusive to defendant and to defendant's mother, Francine. When defendant was a young child, his father killed his mother. Defendant's maternal aunt was at the Smiths' house soon after the murder, and defendant tried to indicate to her that his mother's body was in the closet. After his mother's murder, defendant was removed from his home. About a year and a half or two years later, Robert Smith, Sr., was released from jail and regained custody of defendant.

When defendant was in his youth, he was sent to Napa State Hospital, a psychiatric facility. After a short time had passed, defendant was incarcerated at the California Youth Authority (CYA). During this period, defendant seemed depressed and paranoid. These bouts of paranoia seemed to correlate with periods when defendant did not take the medication that had been prescribed for his mood and behavioral problems. After defendant was released from CYA, shortly before the murders, defendant acted strangely; he babbled and behaved in a paranoid fashion. Around this time, Dr. Champlin, a psychiatrist at the county hospital where defendant was briefly involuntarily admitted, diagnosed defendant with schizoaffective disorder. Defendant's aunt testified that, during this period, it appeared that defendant knew the difference between right and wrong.

Dr. George Woods and Dr. Martin Blinder, who had been appointed to evaluate defendant following his not guilty by reason of insanity plea, both

testified during the sanity phase. Dr. Woods testified that defendant's psychiatric files, CYA and other juvenile court records, and social services records of his family circumstances revealed an extensive family history of bipolar disorder, substance abuse, and psychosis.

Defendant had been committed to psychiatric treatment facilities, including Napa State Hospital, from the age of nine years; while in these treatment facilities he exhibited psychotic behavior, and testing revealed some organic brain dysfunction. When discharged from Napa, defendant was diagnosed with a conduct disorder involving aggressive behavior.

Based on the records of tests conducted on defendant in the past and the relative levels of success of defendant's current and prior use of lithium, which had been prescribed to defendant at various points in his life, Dr. Woods believed that defendant had been misdiagnosed and was instead suffering from an organic mood disorder with features of bipolar disorder. Dr. Woods opined that, based on the information he had reviewed, defendant was in a severe manic state at the time of the killings, which would have made it impossible for him to initiate any action. Dr. Woods opined that defendant was more likely to have followed a cohort's actions. Dr. Woods's conclusion was that defendant had not been able to understand the nature and quality of his actions at the time of the offense, but that he would have understood the difference between right and wrong.

Dr. Blinder's testimony was far less favorable to defendant. He described defendant as a "sociopath," and also commented that defendant was essentially dyslexic. He opined that defendant had a genetic predisposition for psychopathy and antisocial characteristics, and that such disorders were essentially untreatable. In Dr. Blinder's opinion, defendant's symptoms were consistent with antisocial personality disorder; he especially emphasized defendant's lack of remorse for hurting people. Dr. Blinder found no psychiatric evidence that defendant was legally insane at the time of the offenses.

Defendant also presented other expert witnesses, including Dr. Myla Young and Dr. Samuel Benson. Dr. Young testified that defendant's ability for verbal comprehension was "borderline" and his overall intellectual functioning was "in the low average range," and that defendant suffered from significant brain damage, as well as an organic mood disorder involving mania and depression. Dr. Benson, a psychiatrist, concluded that defendant suffered from organic brain disease and bipolar disorder. He noted that defendant had lesions on his left temporal and parietal lobes, which could cause violent and unpredictable behavior. Dr. Benson opined that at the time of the murders, defendant knew the difference between right and wrong, but could not appreciate the nature and consequence of his acts.

### 2. *Prosecution Rebuttal Evidence*

In rebuttal, the prosecution called several witnesses to dispute the testimony of the defense witnesses. Dr. Sandra Klein testified that the intelligence tests administered to defendant by Dr. Young had been erroneously scored, and also that defendant showed no evidence of organic brain damage. Another prosecution witness diagnosed defendant with antisocial personality disorder. The prosecution also presented testimony by a CYA counselor, who concluded that defendant was a "predator" who knew the difference between right and wrong and could understand the nature and quality of his actions.

### 3. *Defense Surrebuttal Evidence*

The defense called Dr. Dale Watson to rebut Dr. Sandra Klein's testimony that Dr. Young's test results were erroneously scored. Dr. Watson criticized Dr. Klein's analysis and testified that the testing showed evidence of organic brain damage. Dr. Watson also discussed psychological testing performed by Dr. Oliver Glover, a psychologist who had testified in support of defendant's pretrial motion to suppress statements he made during police interviews.

### D. *Penalty Phase Evidence*

### 1. *Prosecution Evidence*

The prosecution's case in aggravation centered upon many violent acts committed by defendant prior to the murders.

While he was incarcerated at CYA facilities, defendant became violent toward the youth counselors and other wards on several occasions. For example, defendant hit another ward with a closed fist in June 1985, and threw one chair at a window and another chair at two youth counselors in August 1985. In March 1986, defendant assaulted a counselor, causing minor injuries. In two separate incidents, defendant threatened to kill youth counselors at CYA facilities. Eventually, defendant was transferred to a special unit within the CYA that housed the most violent offenders. While housed in this unit, defendant was involved in an altercation with another ward, continuing to assault the other ward despite staff members' use of Mace, until four staff members were finally able to subdue him.

After his release from CYA custody, defendant was arrested on domestic violence charges. Even after officers responded to the report of domestic violence, defendant continued to assault the victim.

While in pretrial custody on the present charges at the Martinez Detention Facility, defendant claimed that he had failed to receive his medication.

Returning to his cell after receiving his medication, defendant suddenly darted into the cell of another inmate and punched the inmate several times. He continued to assault the inmate until he was sprayed with Mace and restrained. The reason underlying the assault was that the inmate formerly had given defendant extra food and toiletries, but recently had stopped doing so.

On the same day as that assault, defendant displayed out-of-control behavior, such as kicking doors and overturning tables, which he continued even after being sprayed with Mace. Four deputies were required to restrain him. After he was transported to the facility's discipline module, defendant again became combative and told the deputies: "I have got the death penalty coming. I have got nothing to lose. As soon as I get these . . . handcuffs off, I'm going to get you guys. I have got the death penalty." Little more than a month later, he assaulted a deputy.

Later during defendant's incarceration in the Martinez Detention Facility, deputies performing a routine security check of defendant's cell found that the metal screen covering the window had been pried loose; they also recovered a piece of iron from under defendant's bunk that matched the pry marks on the metal screen. When deputies told defendant that he would be transferred to a different cell and would receive a writeup for destruction of jail property, defendant became verbally abusive toward the deputies. He repeatedly used the intercom between his cell and the deputies' booth to insult the deputies, and destroyed the intercom after the deputies turned the intercom off. Immediately after breaking the intercom, defendant used a wooden desk to break down the cell door, and walked out of his cell, challenging the deputies to come get him. The deputies escorted defendant to a rubber-lined safety room, and, after defendant became combative and attempted to bite and spit on the deputies, he was shackled and chained to the floor.

On February 28, 1992, defendant appeared for a hearing in Contra Costa County Superior Court. When the prosecutor placed a witness list in front of defense counsel at the conclusion of the proceedings, defendant became very agitated. After he was handcuffed, defendant screamed obscenities and said that he "might as well let this deputy shoot [him] right now." He ran toward the chambers area of the courtroom and was wrestled to the ground. Defendant attempted to grab one of the deputies' guns. After the court reporter pressed the emergency button, four deputies arrived and subdued defendant. Defendant was placed in a cell at the detention facility across the street from the courthouse. While there, he kicked the cell door open and further threatened the deputies.

## 2. *Defense Evidence*

The defense case in mitigation focused upon the childhood abuse of defendant by his father, Robert Smith, Sr.

Robert Smith, Sr., was violent towards defendant and the other children in the household. However, his abuse of defendant was particularly brutal, and he treated defendant like he was "some type of animal." Robert Smith, Sr., also abused Francine, his wife and defendant's mother, choking her and beating her.

In early 1975, defendant's aunt visited the Smith residence. The house was covered in blood. Robert Smith, Sr., was attempting to clean up the blood. When asked what had happened, he told the aunt that defendant had had a bloody nose. The aunt returned with other family members. When defendant told his aunt that his mother's body was in the closet, defendant's father kicked him and threw him into another room. The family left the house. Defendant's father wrapped the body in paper bags and blankets, dumped it in an area near Martinez, and fled to Mississippi.

Defendant was removed from parental custody, was notified that his father had killed his mother, and was placed in a foster home. Will and Berta Lias, defendant's foster parents, had no problems with defendant and recalled him being a relatively normal child.

Robert Smith, Sr., was convicted of voluntary manslaughter and served a nine-month jail term. Upon his release, he returned to California and regained custody of his children. Defendant had a difficult time readjusting to living with his father and began behaving violently toward his siblings. Defendant was removed from the Smith home in 1978, after exhibiting uncontrollable behavior and rage toward the other family members. He was eventually placed in a psychiatric institute.

Defendant's primary counselor during one of his CYA placements recalled that defendant was pleasant and performed well most of the time. He conceded that defendant had been disciplined for violent offenses while at the facility and could not control his anger. The counselor eventually recommended that defendant be transferred out of the facility. Two other youth counselors who had experience dealing with defendant during his incarceration in CYA facilities testified that defendant responded warmly when treated with respect and interacted well with the other wards.

## II. DISCUSSION

### A. *Admission of Defendant's Statements to Police*

On March 25 and 26, 1991, defendant was in police custody and was interrogated by Richmond police officers. Defendant contends that admission of his confession violated his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution.[4] He argues that several factors rendered his statements involuntary and unreliable: 1) defendant's mental impairments made him particularly vulnerable during the interviews; 2) he was misled about the time necessary to obtain counsel; 3) the detectives failed to readminister *Miranda* warnings at the beginning of the second interview; 4) the fictitious "Neutron Proton Negligence Intelligence Test" administered by police was coercive; and 5) the audiotapes of defendant's interviews are incomplete.

### 1. *Factual Background*

After defendant's arrest on Monday, March 25, 1991, police officers brought him to the Richmond police headquarters. Detectives interviewed defendant twice. The first interview began on the evening of March 25 and lasted six hours, concluding in the early morning hours of March 26; the second interview began in the afternoon of March 26 and lasted approximately an hour and a half.

At the outset of the first interview, Detective Kimura advised defendant of his rights under *Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602].[5] Defendant asked Detective Kimura, "[I]f I don't talk to you

---

[4] Defendant urges in this and a number of other claims that the error or misconduct he is asserting infringed various of his constitutional rights to due process and a fair trial. What we stated in *People v. Boyer* (2006) 38 Cal.4th 412, 441, footnote 17 [42 Cal.Rptr.3d 677, 133 P.3d 581], applies here: "In most instances, insofar as defendant raised the issue at all in the trial court, he failed explicitly to make some or all of the constitutional arguments he now advances. In each instance, unless otherwise indicated, it appears that either (1) the appellate claim is of a kind . . . that required no trial court action by the defendant to preserve it, or (2) the new arguments do not invoke facts or legal standards different from those the trial court itself was asked to apply, but merely assert that the trial court's act or omission, insofar as wrong for the reasons actually presented to that court, had the additional *legal consequence* of violating the Constitution. To that extent, defendant's new constitutional arguments are not forfeited on appeal. [Citations.] [¶] In the latter instance, of course, rejection, on the merits, of a claim that the trial court erred on the issue actually before that court necessarily leads to rejection of the newly applied constitutional 'gloss' as well. No separate constitutional discussion is required in such cases, and we therefore provide none."

[5] Detective Kimura advised defendant of his *Miranda* rights as follows: "You have the right to remain silent. You do not have to answer my questions or talk to me. Anything you say can be used against you in court. You have the right to talk to a lawyer, uh before you are asked

now, how long will it take for me to talk to you 'fore a person sent a lawyer to be here?" Before Detective Kimura could answer the question, defendant told the detective, "I could wait 'til next week sometime." Detective Kimura said: "Maybe, yeah." Defendant then told the detective: "I'll talk to you now. I don't got nothing to hide."

Defendant initially was informed that he was under investigation for automobile theft. Defendant stated that he had been approached by Joseph and two other men, who wanted defendant's help opening a safe. After later being told that he was under investigation for murder, defendant admitted that he had been present at the apartment during the murders, but told the detectives that Joseph and two other men had killed Dorsey and Martin. At the end of the interview, Detective Kimura booked defendant into custody for murder.

The second interview began less than 12 hours after the conclusion of the first interview and lasted for about an hour and a half. Detective Kimura asked defendant whether he remembered being read his *Miranda* rights during the previous interview and whether he was still comfortable talking about the case. Defendant had no objections to speaking about the case, telling Detective Kimura that he "pretty much" remembered the *Miranda* advisements and had no objections to talking further about the case. Detective Kimura concluded that defendant did not want or need a *Miranda* readvisement.

During the second interview, Detective Kimura told defendant that he wanted to conduct a "test" called the "Neutron Proton Negligence Intelligence Test" that purportedly would determine whether defendant had recently fired a gun. No such test exists. In the first step of the "test," the detectives sprayed defendant's hands with soap and patted them with a paper towel. In the second step, they used a field test kit used for testing substances suspected of being cocaine, which the detectives knew inevitably would turn color. Detective Kimura told defendant that the test had provided proof that defendant had recently fired a gun. Defendant continued to deny shooting Dorsey and Martin. However, defendant did admit that only he and Joseph were involved in the murders, and that the two other men he had said were involved in the crimes had not been present.

Defendant filed a pretrial motion to exclude his statements. Among other things, he argued that his statements were involuntary because he was misled about the time necessary to obtain counsel, the detectives failed to readminister *Miranda* warnings at the beginning of the second interview, and the

---

any questions and to have . . . the lawyer present with you during questioning. If you cannot afford to hire a lawyer, one will be appointed to represent you free of charge before any questions if you wish."

fictitious "Neutron Proton Negligence Intelligence Test" administered by police was coercive. Defendant did not argue that the statement was rendered involuntary because the audiotapes of defendant's interviews are incomplete, and it is not clear that defendant sufficiently raised the argument that his mental impairments made him particularly vulnerable during the interviews at trial. The trial court denied the motion, noting that defendant had consistently denied being the shooter during both interviews: "Mr. Smith was steadfast in his position, and [the detectives] could never shake him from that despite their continued questioning."

### 2. Legal Principles

■ The federal and state Constitutions both bar the use of involuntary confessions against a criminal defendant. (*Jackson v. Denno* (1964) 378 U.S. 368, 385–386 [12 L.Ed.2d 908, 84 S.Ct. 1774]; *People v. Benson* (1990) 52 Cal.3d 754, 778 [276 Cal.Rptr. 827, 802 P.2d 330].) A confession is involuntary if it is "not ' "the product of a rational intellect and a free will" ' " (*Mincey v. Arizona* (1978) 437 U.S. 385, 398 [57 L.Ed.2d 290, 98 S.Ct. 2408]), such that the defendant's "will was overborne at the time he confessed." (*Lynumn v. Illinois* (1963) 372 U.S. 528, 534 [9 L.Ed.2d 922, 83 S.Ct. 917].) In assessing allegedly coercive police tactics, "[t]he courts have prohibited only those psychological ploys which, under all the circumstances, are so coercive that they tend to produce a statement that is both involuntary and unreliable." (*People v. Ray* (1996) 13 Cal.4th 313, 340 [52 Cal.Rptr.2d 296, 914 P.2d 846].) Whether a statement is voluntary depends upon the totality of the circumstances surrounding the interrogation. (*People v. Neal* (2003) 31 Cal.4th 63, 79 [1 Cal.Rptr.3d 650, 72 P.3d 280].)

■ In *Miranda v. Arizona*, the high court held that police must advise a criminal suspect who is in custody of specified Fifth Amendment rights prior to questioning. (*Miranda v. Arizona, supra*, 384 U.S. 436.) As we have held: "Under the familiar requirements of *Miranda*, . . . a suspect may not be subjected to custodial interrogation unless he or she knowingly and intelligently has waived the right to remain silent, to the presence of an attorney, and to appointed counsel in the event the suspect is indigent." (*People v. Sims* (1993) 5 Cal.4th 405, 440 [20 Cal.Rptr.2d 537, 853 P.2d 992].)

■ "*Miranda* holds that '[t]he defendant may waive effectuation' of the rights conveyed in the warnings 'provided the waiver is made voluntarily, knowingly and intelligently.' [Citation.] The inquiry has two distinct dimensions. [Citations.] First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being

abandoned and the consequences of the decision to abandon it. Only if the 'totality of the circumstances surrounding the interrogation' reveals both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived. [Citations.]" (*Moran v. Burbine* (1986) 475 U.S. 412, 421 [89 L.Ed.2d 410, 106 S.Ct. 1135]; see also *People v. Combs* (2004) 34 Cal.4th 821, 845 [22 Cal.Rptr.3d 61, 101 P.3d 1007].)

In reviewing *Miranda* issues on appeal, we accept the trial court's resolution of disputed facts and inferences as well as its evaluations of credibility if substantially supported, but independently determine from undisputed facts and facts found by the trial court whether the challenged statement was legally obtained. (*People v. Storm* (2002) 28 Cal.4th 1007, 1022–1023 [124 Cal.Rptr.2d 110, 52 P.3d 52]; *People v. Cunningham* (2001) 25 Cal.4th 926, 992 [108 Cal.Rptr.2d 291, 25 P.3d 519].)

### 3. *Defendant's Mental Impairments*

Defendant contends that his particular mental state at the time of the interviews rendered his statements involuntary. In particular, defendant asserts that he had a family history of physical, psychological, and sexual abuse, had previously been committed to a mental hospital, and had significant brain damage. It is not clear from the record that defendant sufficiently raised this argument at trial. However, respondent does not object to the claim on this ground, and we will address the merits of this claim.

Insofar as a defendant's claims of involuntariness emphasize that defendant's particular psychological state rendered him open to coercion, this court has noted that "[t]he Fifth Amendment is not 'concerned with moral and psychological pressures to confess emanating from sources other than official coercion.' " (*People v. Bradford* (1997) 14 Cal.4th 1005, 1041 [60 Cal.Rptr.2d 225, 929 P.2d 544], quoting *Oregon v. Elstad* (1985) 470 U.S. 298, 304–305 [84 L.Ed.2d 222, 105 S.Ct. 1285]; see also *Colorado v. Connelly* (1986) 479 U.S. 157, 165 [93 L.Ed.2d 473, 107 S.Ct. 515] [while mental condition is relevant to an individual's susceptibility to police coercion, a confession must result from coercive state activity before it may be considered involuntary].) The record does not convince us that the interrogating officers were aware of, or exploited, defendant's claimed psychological vulnerabilities in order to obtain statements from him.

### 4. *Request for Counsel*

Defendant also maintains that Detective Kimura misrepresented the availability of counsel when advising defendant of his *Miranda* rights and thereby unconstitutionally induced defendant into waiving his right to counsel.

During the *Miranda* advisement process, defendant asked Detective Kimura how long it would take to get an attorney appointed. Before Detective Kimura could answer, defendant told him that he could wait until "next week sometime." In response, Detective Kimura said, "Maybe, yeah."

■ *Miranda* requires that a suspect be informed that "he has the right to an attorney before and during questioning, and that an attorney would be appointed for him if he could not afford one." (*Duckworth v. Eagan* (1989) 492 U.S. 195, 204 [106 L.Ed.2d 166, 109 S.Ct. 2875], fn. omitted.) In *Duckworth*, the high court approved of *Miranda* warnings that explained that the suspect had a right to consult with counsel before being questioned, but that an attorney would be appointed " 'if and when' " he appeared in court. (*Ibid.*) The court in *Duckworth* noted that "[t]he Court in *Miranda* emphasized that it was not suggesting that 'each police station must have a "station house lawyer" present at all times to advise prisoners.' [Citation.] If the police cannot provide appointed counsel, *Miranda* requires only that the police not question a suspect unless he waives his right to counsel. [Citation.] Here, respondent did just that." (*Ibid.*) In other words, *Miranda* does not require that attorneys be producible on call, or that police "keep a suspect abreast of his various options for legal representation." (*People v. Bradford, supra,* 14 Cal.4th at p. 1046.)

Here, defendant was told in no uncertain terms that he had the right to consult with, to be represented by, and to have an attorney present before and during questioning, and the further right to have counsel appointed if he was indigent. Defendant never requested an attorney or indicated that he wished to end the interview. (See *People v. Whitson* (1998) 17 Cal.4th 229, 249–250 [70 Cal.Rptr.2d 321, 949 P.2d 18].)

Contrary to defendant's contention that Detective Kimura "lied" about the availability of counsel, Detective Kimura did not actively mislead defendant. Detective Kimura never told defendant that it would take a week for counsel to be appointed, but merely responded equivocally to defendant's statement that he could wait up to a week for counsel to be appointed. The detective never represented to defendant that it actually would take up to a week for counsel to be appointed.

Although defendant posits that Kimura should have corrected defendant's assumption that it could take up to a week to get counsel, he cites no authority for the proposition that a suspect who has received and understood the *Miranda* advisements cannot properly waive his Fifth Amendment rights if he labors under any misapprehension of the mechanics of when and how counsel is appointed. Indeed, several federal circuit courts have held that a suspect's *Miranda* waiver remains valid even if interrogating officers mislead

the suspect about how long it will take to appoint counsel. (See *Soffar v. Cockrell* (5th Cir. 2002) 300 F.3d 588, 591, 596 [holding that a detective's speculation that "it could take as little as one day or as long as a month" for a suspect to obtain counsel did not invalidate the suspect's *Miranda* waiver]; *Richardson v. Duckworth* (7th Cir. 1987) 834 F.2d 1366, 1367, 1371 [holding that defendant had been fully apprised of his constitutional rights where he was given a *Miranda* advisement and told upon two occasions that he had the right to speak to a lawyer before being questioned, made an incriminating statement, and then, upon inquiry, was told by the detective that a lawyer would be appointed in court].)

### 5. *Failure to Readvise Defendant of* Miranda *Rights*

Defendant further faults Detective Kimura for failing to readvise him of his Fifth Amendment rights when the second interview began.

■ This court repeatedly has held that a *Miranda* readvisement is not necessary before a custodial interrogation is resumed, so long as a proper warning has been given, and "the subsequent interrogation is 'reasonably contemporaneous' with the prior knowing and intelligent waiver." (*People v. Mickle* (1991) 54 Cal.3d 140, 170 [284 Cal.Rptr. 511, 814 P.2d 290] (*Mickle*); see *People v. Braeseke* (1979) 25 Cal.3d 691, 701–702 [159 Cal.Rptr. 684, 602 P.2d 384], judg. vacated and cause remanded *sub. nom. California v. Braeseke* (1980) 446 U.S. 932 [64 L.Ed.2d 784, 100 S.Ct. 2147], reaffd. (1980) 28 Cal.3d 86 [168 Cal.Rptr. 603, 618 P.2d 149].)

■ We have established several factors to determine whether readvisement is necessary prior to a subsequent interrogation held after an earlier valid *Miranda* waiver: 1) the amount of time that has passed since the initial waiver; 2) any change in the identity of the interrogator or location of the interrogation; 3) an official reminder of the prior advisement; 4) the suspect's sophistication or past experience with law enforcement; and 5) further indicia that the defendant subjectively understands and waives his rights. (*Mickle, supra,* 54 Cal.3d at p. 170.) In *Mickle,* we found that readvisement was unnecessary when 36 hours had elapsed between interrogations, because the defendant was still in custody, was interviewed by the same interrogators, was reminded of his prior waiver, and was familiar with the justice system, and there was nothing to indicate he was mentally impaired or otherwise incapable of remembering the prior advisement. (*Id.* at p. 171.)

In this case, the second interrogation occurred less than 12 hours after the first interrogation ended. Defendant remained in custody in the interim. The same officers conducted the interrogation, in the same office, and asked defendant whether he remembered the *Miranda* warnings, or if he would like

to hear them again. Defendant declined, stating that he remembered the advisements and still wished to speak with the officers. There is no indication on the record that the officers should have suspected that defendant was mentally impaired or otherwise incapable of remembering the prior advisement. Finally, because defendant had been incarcerated in the CYA and arrested for domestic violence in 1990, defendant was quite familiar with the criminal justice system.

Under these circumstances, Detective Kimura was not required to readvise defendant of his *Miranda* rights.

### 6. The "Neutron Proton Negligence Intelligence Test"

During the second interview, the officers conducted what they told defendant was called the "Neutron Proton Negligence Intelligence Test." As we have described, this test was a sham. When the officers indicated that the "test" was positive, and that defendant had fired a gun recently, defendant repeatedly and vehemently denied ever shooting a gun.

After the test was given, and defendant had been told that the result was positive for gunshot residue, defendant recanted the portion of his statement implicating the two unnamed men; according to defendant, only he and Joseph were involved, and Joseph had been the shooter. Defendant now contends that the officers' use of a sham test was a deceptive tactic that rendered defendant's incriminating statements involuntary.

Police deception "does not necessarily invalidate an incriminating statement." (*People v. Maury* (2003) 30 Cal.4th 342, 411 [133 Cal.Rptr.2d 561, 68 P.3d 1].) Courts have repeatedly found proper interrogation tactics far more intimidating and deceptive than those employed in this case. (See, e.g., *Frazier v. Cupp* (1969) 394 U.S. 731, 739 [22 L.Ed.2d 684, 89 S.Ct. 1420] [officer falsely told the suspect his accomplice had been captured and confessed]; *People v. Jones* (1998) 17 Cal.4th 279, 299 [70 Cal.Rptr.2d 793, 949 P.2d 890] [officer implied he could prove more than he actually could]; *People v. Thompson* (1990) 50 Cal.3d 134, 167 [266 Cal.Rptr. 309, 785 P.2d 857] [officers repeatedly lied, insisting they had evidence linking the suspect to a homicide]; *In re Walker* (1974) 10 Cal.3d 764, 777 [112 Cal.Rptr. 177, 518 P.2d 1129] [wounded suspect told he might die before he reached the hospital, so he should talk while he still had the chance]; *People v. Watkins* (1970) 6 Cal.App.3d 119, 124–125 [85 Cal.Rptr. 621] [officer told suspect his fingerprints had been found on the getaway car, although no prints had been obtained]; *Amaya-Ruiz v. Stewart* (9th Cir. 1997) 121 F.3d 486, 495 [suspect falsely told he had been identified by an eyewitness].) Indeed, at least one Court of Appeal has approved of the particular practice used in this case.

(*People v. Parrison* (1992) 137 Cal.App.3d 529, 537 [187 Cal.Rptr. 123] [police falsely told suspect a gun residue test produced a positive result].)

After examining the circumstances surrounding the "Neutron Proton Negligence Intelligence Test," it does not appear that the tactic was so coercive that it tended to produce a statement that was involuntary or unreliable. In any event, we also note that the officers' tactic in using the fake test was unsuccessful in eliciting a confession; defendant never confessed to having been the shooter, but instead steadfastly denied having shot the gun.

Defendant contends that the deceptive tactic, though unsuccessful in eliciting a confession to firearm use, coerced him into revising his story and telling police that the two other men he had implicated were not involved. However, it is evident that the "test" was designed to elicit a confession related to firearm use. The absence or presence of the two men has little relation to whether defendant shot a firearm on the night of the murders.

### 7. *Lapse in Taped Recording of Defendant's Statement*

Both interrogations of defendant were tape-recorded by the interrogating officers. However, one half-hour segment of the first interrogation was either not recorded or taped over. Defendant now contends that the lapse in the recording occurred during a critical period in the interrogation. He argues that immediately before the unrecorded portion of the interrogation, defendant had not seriously incriminated himself, and that it was only after the unrecorded portion that he made self-incriminating statements. Defendant argues that, without a recording of this critical period, the People cannot meet their burden of proving that the statement was voluntary.

Defendant did not argue at trial that the court should exclude his statements because of the lapse in the audio recording. However, the trial court reviewed the tapes independently while considering defendant's pretrial motion to exclude the statements and noticed the lapse. At the beginning of the pretrial hearing on the motion, the trial court pointed out to counsel that one side of one tape was blank. Although defense counsel had also noticed the blank portion of the recording, he seems not to have considered it problematic. He explained, "There is a blank one and—on one side 'cause it puzzled me the first time I listened to it, but it seemed that the chronology continued on on the next tape." There was no discussion during the hearing of whether the lapse should have affected the trial court's decision as to whether defendant's statement was voluntary.

Defendant has forfeited this claim by failing to object in the trial court to the incomplete recording of defendant's interviews. (*People v. Saunders*

(1993) 5 Cal.4th 580, 589–590 [20 Cal.Rptr.2d 638, 853 P.2d 1093].) Because the trial court had no opportunity to address any possible factual disputes about what occurred during the lapse in recording, we will not address this claim for the first time on appeal. (*People v. Ray, supra,* 13 Cal.4th at p. 339 [where defendant sought suppression of his confession at trial only on the ground that there was a delay in advising him of his *Miranda* rights, his claim that the confession was involuntary because it was given in exchange for a promised benefit was forfeited on appeal].)

Defendant also alleges that the police "did something" to make defendant change his story during the unrecorded portion of the tape. However, defendant acknowledges that his argument relies upon matters outside of the record in this case, which may not be considered on appeal. The mere fact that there was a lapse in the recording of the first interrogation in no way establishes that defendant's subsequent statements were involuntary or coerced.

### B. *Disclosure of Dr. Glover's Testing Data*

The trial court, after a defense-retained psychologist referred to psychological tests taken by defendant, ordered that the psychological test data be turned over to the prosecution. Defendant contends that this order was reversible error.

### 1. *Factual Background*

Dr. Oliver Glover, a psychologist, testified in support of defendant's pretrial motion to suppress statements he made during the police interviews of March 25 and 26, 1991. Dr. Glover had listened to the tapes of the police interrogations in order to form an opinion on whether defendant's statements were made voluntarily.

At the suppression hearing, Dr. Glover opined that defendant's statements were made involuntarily. According to Dr. Glover, several factors combined to render defendant's statements involuntary: 1) defendant's fatigue; 2) his recent marijuana use; 3) the fictitious gunshot residue test; and 4) an anxiety condition causing a panic response in defendant when confronted by authority figures.

Dr. Glover noted that he had administered numerous psychological tests to defendant. Although Dr. Glover stated that he did not give the tests to defendant in order to assess the voluntariness of defendant's statements to police, he acknowledged that he referred to the tests, and also to notes taken during examinations of defendant, in order to refresh his recollection before

testifying. Additionally, Dr. Glover stated that he examined the tests to formulate his opinion about defendant's anxiety condition and to support his general diagnosis.

The prosecution moved to discover Dr. Glover's test data, pursuant to Evidence Code sections 771 and 721, subdivision (a)(3). Defendant objected to disclosure of Dr. Glover's test data and notes, asserting that disclosure would violate the psychotherapist-patient privilege. The trial court overruled defendant's objection and ordered defense counsel to turn over to the prosecution Dr. Glover's notes, raw data, and the actual test materials. The trial court reasoned that the prosecutor was entitled to discovery of the evidence under Evidence Code section 771 for the purpose of cross-examining Dr. Glover. The record appears to support defendant's assertion that the prosecution never used the notes, raw data, and test materials obtained from Dr. Glover during the suppression hearing.

The prosecution used these materials later, however, during the sanity phase of the trial. The defense objected to the prosecution questioning Dr. Paul Berg, a witness called by the prosecution, about Dr. Glover's results on the ground that it was improper for a witness to give an opinion based on another person's report. The trial court overruled this objection. Dr. Berg testified that defendant's scores on one psychological test showed that the proper diagnosis for defendant "clearly would be antisocial personality disorder." Dr. Dale Watson, a witness called by the defense, was asked on cross-examination about certain of Dr. Glover's testing. Dr. Watson testified that, when asked to describe an image of the profile of a man standing in a window or French door, defendant responded: "This is a burglar creeping into the window of a house to remove items he shouldn't have. He will soon exit the house and sell the items for cash money. He will get his money, have a good time, get broke, and do another burglary." Additionally, during closing argument, the prosecution argued that Dr. Glover's data revealed inconsistencies in defendant's testing indicating that he was malingering and emphasized Dr. Berg's conclusion that defendant had antisocial personality disorder.

## 2. *Discussion*

Defendant contends that the trial court committed reversible error in requiring disclosure to the prosecution of Dr. Glover's notes, test data, and test materials. He argues that this disclosure violated his Sixth Amendment right to effective assistance of counsel, as embodied in the psychotherapist-patient privilege (Evid. Code, § 1014) and attorney-client privilege (Evid. Code, § 954) violated his Fifth Amendment protection against self-incrimination, and led to a verdict of death in violation of his Eighth Amendment rights. However, during trial, the defense objected to the disclosure of Dr. Glover's

materials only on the ground of the psychotherapist-patient privilege. Defendant has not identified, nor is the court aware of, any portion of the record showing that any other objection was made to this disclosure during the suppression hearing. Accordingly, defendant's other grounds for appealing the disclosure have been forfeited.

■ The trial court did not err in requiring disclosure of Dr. Glover's materials. Evidence Code section 771, subdivision (a), provides: "[I]f a witness, either while testifying or prior thereto, uses a writing to refresh his memory with respect to any matter about which he testifies, such writing must be produced at the hearing at the request of an adverse party and, unless the writing is so produced, the testimony of the witness concerning such matter shall be stricken." The "adverse party may . . . inspect the writing, cross-examine the witness concerning it, and introduce in evidence such portion of it as may be pertinent to the testimony of the witness." (Evid. Code, § 771, subd. (b).) Additionally, Evidence Code section 721, subdivision (a), provides in pertinent part that "a witness testifying as an expert may be cross-examined to the same extent as any other witness and, in addition, may be fully cross-examined as to . . . the matter upon which his or her opinion is based and the reasons for his or her opinion." Such cross-examination properly includes documents and records examined by an expert witness in preparing his or her testimony. (*People v. Osband* (1996) 13 Cal.4th 622, 712 [55 Cal.Rptr.2d 26, 919 P.2d 640].)

Dr. Glover stated during his testimony that he used the tests to refresh his recollection before testifying at the hearing. Defendant disputes whether Dr. Glover actually consulted the test data before testifying, relying on statements made by Dr. Glover that his opinion in court was not based upon any psychological tests whatsoever. However, defendant fails to note that Dr. Glover made these statements more than a month *after* the trial court had ordered that the prosecution be given the test materials. Dr. Glover's contradictory statements, given well after the trial court's ruling, do not indicate that the trial court abused its discretion in requiring defendant to produce the test data, notes, and materials. Before the trial court ruled on this issue, Dr. Glover had conceded to the prosecution that he had relied upon certain portions of the testing to formulate his opinion about defendant's anxiety condition, which was a strong factor in Dr. Glover's conclusion that defendant's statements were involuntary. Accordingly, the trial court did not abuse its discretion in ruling that without examining the tests upon which Dr. Glover founded his conclusion, the prosecution may not have been able to cross-examine him effectively.

### C. *Denial of Motion to Sever Counts 6 and 10*

Prior to trial, defendant moved to sever from the information count 6 (first degree burglary) and count 10 (conspiracy to commit murder), which involved charges arising out of defendant's return to the victims' apartment after the shootings. Count 6 charged defendant with burglary based upon his theft of several items when he returned to the apartment; count 10 charged defendant with conspiracy to commit murder because he returned to the scene in order to make sure Martin was dead. The trial court denied defendant's motion to sever these counts from the information.

Defendant now contends that the trial court's failure to sever those counts was an abuse of discretion requiring reversal of the judgment, because "[t]he evidence supporting Counts 6 and 10 was extraordinarily prejudicial and added nothing on the question of [defendant's] personal culpability for the deaths of Dorsey and Martin." He contends that this violated his rights to a fair trial under the Fifth, Eighth, and Fourteenth Amendments.

" 'The law prefers consolidation of charges.' " (*People v. Manriquez* (2005) 37 Cal.4th 547, 574 [36 Cal.Rptr.3d 340, 123 P.3d 614]; see *People v. Ochoa* (1998) 19 Cal.4th 353, 409 [79 Cal.Rptr.2d 408, 966 P.2d 442].) "An accusatory pleading may charge two or more different offenses connected together in their commission, or different statements of the same offense or two or more different offenses of the same class of crimes or offenses, under separate counts, and if two or more accusatory pleadings are filed in such cases in the same court, the court may order them to be consolidated." (§ 954.)

We review the trial court's denial of a severance motion for abuse of discretion. (*People v. Ochoa, supra,* 19 Cal.4th at p. 408.) On appeal, the court must consider whether a gross unfairness occurred that denied the defendant a fair trial or due process. (*People v. Cleveland* (2004) 32 Cal.4th 704, 726 [11 Cal.Rptr.3d 236, 86 P.3d 302].) To demonstrate that a denial of severance was reversible error, defendant must " 'clearly establish that there [was] a substantial danger of prejudice requiring that the charges be separately tried.' " (*People v. Davis* (1995) 10 Cal.4th 463, 508 [41 Cal.Rptr.2d 826, 896 P.2d 119], quoting *Frank v. Superior Court* (1989) 48 Cal.3d 632, 640 [257 Cal.Rptr. 550, 770 P.2d 1119].)

Refusal to sever charges on a defendant's motion *may* be an abuse of discretion where: " '(1) evidence on the crimes to be jointly tried would not be cross-admissible in separate trials; (2) certain of the charges are unusually likely to inflame the jury against the defendant; (3) a "weak" case has been joined with a "strong" case, or with another "weak" case, so that the

"spillover" effect of aggregate evidence on several charges might well alter the outcome of some or all of the charges; and (4) any one of the charges carries the death penalty.' " (*People v. Davis, supra,* 10 Cal.4th at p. 508 [joinder of claims was appropriate in a capital case], quoting *People v. Balderas* (1985) 41 Cal.3d 144, 173 [222 Cal.Rptr. 184, 711 P.2d 480].)

The trial court in this case properly exercised its discretion in denying defendant's motion to sever. The statutory requirements for joinder were met in this case. The crimes charged in the counts defendant sought to sever were connected in their commission to the other charges—the crimes charged in counts 6 and 10 were no more than a continuation of the earlier crimes, involving the same victims, the same crime scene, and occurred on the same night as the charged murders.

■ Defendant does not dispute that the crimes charged in counts 6 and 10 were connected in their commission to the remaining charged offenses. Rather, defendant maintains that the trial court abused its discretion because the evidence offered in support of those claims was not cross-admissible to prove the remaining charges and was likely to inflame the jury against defendant. Defendant asserts that the evidence supporting counts 6 and 10 was irrelevant to defendant's personal culpability for the murders of Dorsey and Martin. Even assuming that defendant is correct, this court has noted that complete cross-admissibility is not necessary to justify joinder. (*People v. Cummings* (1993) 4 Cal.4th 1233, 1284 [18 Cal.Rptr.2d 796, 850 P.2d 1].) Additionally, because defendant's return to the apartment to confirm that Martin was dead is relevant to whether the murder was premeditated, it is reasonably probable that evidence relating to the return visit would have been admissible even if the court had ordered severance.

In *People v. Alvarez* (1996) 14 Cal.4th 155 [58 Cal.Rptr.2d 385, 926 P.2d 365], this court found denial of a motion to sever appropriate where two crimes were connected in their commission by a close temporal and spatial relationship, and where the later crime may have been connected to a desire to avoid apprehension for the earlier crime. (*Id.* at p. 188.) Here, the evidence tended to show that defendant returned to the victims' apartment hours after the murders were committed in order to confirm that Martin was dead and unable to "snitch." Defendant's return to the apartment was certainly close in time (the same night) and space (the same apartment) to the earlier crimes. Additionally, defendant returned to the scene of the earlier crimes in order to assure himself that Martin would not be able to identify defendant as the perpetrator. The earlier crimes committed by defendant were so tightly intertwined temporally, spatially, and motivationally with the latter crimes so as to constitute a continuation of the former.

None of the other relevant factors support defendant's contention that counts 6 and 10 should have been severed. The charged offenses of burglary and conspiracy to commit murder were no more likely to inflame the jury against defendant than were the remaining counts. Nor were any of the charged offenses joined to take advantage of a "spillover" effect of aggregate evidence; all charges were proved with the same body of evidence.

We therefore hold that the trial court acted within its discretion in denying defendant's motion to sever counts 6 and 10.

### D. *Impeachment of Joseph with Juvenile Record*

Joseph, whom defendant ultimately identified as the only person present at Dorsey's apartment besides defendant and the victims, testified that defendant shot Dorsey and Martin. The trial court permitted defense counsel to impeach Joseph by questioning him about a letter he wrote while in custody on charges related to the Dorsey and Martin murders, in which he threatened to kill his girlfriend, Jalicia P. In addition, defense counsel sought to impeach Joseph by cross-examining him regarding incidents of prior misconduct noted in his juvenile record, including bicycle thefts, burglaries, and the assault of another ward while in placement. Defense counsel specified to the court that he sought to question Joseph about specific acts of misconduct and did not intend to use Joseph's record itself as impeachment evidence. The trial court reviewed Joseph's juvenile record in camera to determine which, if any, of the incidents in this record could be used by defense counsel. The trial court allowed the defense to question Joseph only about his admission of petty theft in juvenile proceedings in October 1987. Defense counsel noted that there were other sustained petitions in Joseph's juvenile record, but the trial court did not confirm if any additional petitions had been sustained. Instead, it stated that, regardless of other sustained petitions, it would exercise its discretion under Evidence Code section 352 to limit questioning based on Joseph's juvenile record to his admission of petty theft. Defendant contends that the trial court thus improperly limited the defense's impeachment of Joseph, and that Joseph should have been confronted with his entire juvenile criminal history.

The trial court acted within its discretion to permit impeachment as to only one of the incidents in Joseph's juvenile record. "Past criminal conduct involving moral turpitude that has some logical bearing on the veracity of a witness in a criminal proceeding is admissible to impeach, subject to the court's discretion under Evidence Code section 352." (*People v. Harris* (2005) 37 Cal.4th 310, 337 [33 Cal.Rptr.3d 509, 118 P.3d 545], citing *People v. Wheeler* (1992) 4 Cal.4th 284, 295–296 [14 Cal.Rptr.2d 418, 841 P.2d 938].) "[T]he latitude section 352 allows for exclusion of impeachment evidence in individual cases is broad. The statute empowers courts to

prevent criminal trials from degenerating into nitpicking wars of attrition over collateral credibility issues." (*People v. Wheeler, supra,* 4 Cal.4th at p. 296.) Neither during trial nor on appeal has defendant identified specific incidents in Joseph's juvenile file that so demonstrate moral turpitude that they would support a conclusion that excluding them was an abuse of the trial court's discretion. On appeal, defendant now contends that the jury should have been informed of the result of Joseph's juvenile adjudication for his offenses related to the murders of Dorsey and Martin.[6] However, it is not clear that defense counsel sought admission of this evidence during trial or that such evidence would be admissible. (See *People v. Lee* (1994) 28 Cal.App.4th 1724, 1739–1740 [34 Cal.Rptr.2d 723].) Moreover, upon inquiry from the jury, the trial court did inform the jury that Joseph had been charged in juvenile court with two homicides, two robberies, a burglary, and other offenses. Accordingly, defendant has not shown that the trial court abused its discretion under Evidence Code section 352.

Defendant also contends that the trial court, in not allowing him to impeach Joseph with evidence of the conduct underlying his juvenile adjudications for burglary and assault, violated defendant's federal due process right to confront and cross-examine witnesses.

 As the high court has explained, cross-examination is required in order "to expose to the jury the facts from which jurors . . . could appropriately draw inferences relating to the reliability of the witness." (*Davis v. Alaska* (1974) 415 U.S. 308, 318 [39 L.Ed.2d 347, 94 S.Ct. 1105].) "[A] criminal defendant states a violation of the Confrontation Clause by showing that he was prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness . . . ." (*Delaware v. Van Arsdall* (1986) 475 U.S. 673, 680 [89 L.Ed.2d 674, 106 S.Ct. 1431].) The trial court, of course, has a "wide latitude" of discretion to restrict cross-examination and may impose reasonable limits on the introduction of such evidence. (*Id.* at p. 679.) Thus, "unless the defendant can show that the prohibited cross-examination would have produced 'a significantly different impression of [the witnesses'] credibility' [citation], the trial court's exercise of its discretion in this regard does not violate the Sixth Amendment." (*People v. Frye* (1998) 18 Cal.4th 894, 946 [77 Cal.Rptr.2d 25, 959 P.2d 183], quoting *Delaware v. Van Arsdall, supra,* 475 U.S. at p. 680.)

Here, defendant has failed to show that the cross-examination of Joseph sought by defense counsel—impeachment based upon Joseph's juvenile record—would have produced a significantly different impression of Joseph's

---

[6] The result of Joseph's juvenile adjudication for these offenses is not evident from the record.

testimony. The trial court allowed some impeachment of Joseph based on an admitted juvenile offense, as well as with the threatening note written to his girlfriend. Joseph's testimony on direct examination yielded additional evidence unfavorable to his character; he admitted assisting defendant in loading the gun, breaking into Dorsey's safe, and keeping items from the robbery. Additionally, the trial court's statement that Joseph had been charged in juvenile court with homicide, robbery, burglary, and other offenses supplied the jury with further impeachment evidence.

Given the wealth of evidence introduced at trial that tended to show Joseph was no stranger to the criminal justice system, defendant has not shown that introduction of conduct underlying additional alleged, and perhaps sustained, juvenile offenses would have produced a significantly different impression of Joseph's testimony. We therefore reject defendant's claim that the trial court deprived him of his federal confrontation right by disallowing defense counsel from introducing any evidence of additional juvenile offenses as evidence to further impeach Joseph.

### E. *Testimony Regarding Absent Defense Witness*

Just prior to testifying at defendant's trial, Joseph was placed in a holding cell next to defendant. At trial, Joseph testified that while they were in the holding cells, defendant told him that he planned to bring forward a witness that would say that Joseph had admitted killing Dorsey and Martin. When Joseph expressed confusion, defendant purportedly told him that a witness named "Alfred" would be testifying at trial. No witness named Alfred testified at trial, and Joseph testified that he never told anyone that he killed Dorsey and Martin.

At a sidebar conference, defense counsel objected to the introduction of testimony about "Alfred," noting that it would be improper for the prosecution to elicit information identifying which witnesses defendant intended to call later during the trial. In particular, defense counsel was concerned that the testimony would make defendant "look bad in the eyes of the jury" if counsel failed to call "Alfred." The trial court overruled the objection.

Defendant contends that the trial court erred in allowing Joseph to testify about defendant's holding cell statement, because: 1) the testimony violated the work product privilege, and thus violated defendant's Sixth Amendment right to effective assistance of counsel; 2) the trial court failed to conduct a hearing sua sponte pursuant to Evidence Code section 402; and 3) no limiting instruction was given to the jury as to the purpose of the statement. Defendant contends that these errors violated his rights under the Fifth, Eighth, and Fourteenth Amendments.

### 1. Work Product Privilege

 The work product privilege bars the use of statutory discovery procedures to obtain "[a] writing that reflects an attorney's impressions, conclusions, opinions, or legal research or theories" (Code Civ. Proc., § 2018.030, subd. (a)), and bars discovery of "[t]he work product of an attorney, other than a writing," unless denial of discovery would unfairly prejudice a party. (Code Civ. Proc., § 2018.030, subd. (b).) This privilege reflects "the policy of the state to . . . [¶] (a) [p]reserve the rights of attorneys to prepare cases for trial with that degree of privacy necessary to encourage them to prepare their cases thoroughly and to investigate not only the favorable but the unfavorable aspects of those cases[; and] [¶] (b) [p]revent attorneys from taking undue advantage of their adversary's industry and efforts." (Code Civ. Proc., § 2018.020.)

Assuming that "Alfred" existed and was a witness that defendant thought would be called at his trial, the disputed testimony does not come within the purview of the work product privilege. The information was not a written product, nor does defendant's statement qualify as an aspect of defense counsel's impressions, opinions, legal research or theories "other than a writing." (See *Dowden v. Superior Court* (1999) 73 Cal.App.4th 126, 135 [86 Cal.Rptr.2d 180].)

Further, as defense counsel did not confirm at sidebar that "Alfred" existed, or verify whether defendant planned to call him as a witness, it was possible that defendant's statement to Joseph did not encompass any information known by defense counsel, let alone counsel's work product. Indeed, defendant now contends that "Alfred" did not exist and that Joseph fabricated defendant's statement. It is difficult to imagine how an allegedly fabricated statement by Joseph regarding a nonexistent witness could be considered to be protected work product.

### 2. Failure to Hold a Preliminary Fact Hearing

 Defendant also argues that the trial court should have held a preliminary fact hearing pursuant to Evidence Code section 402 to determine whether Joseph had fabricated his testimony regarding "Alfred." Evidence Code section 402 provides that "[w]hen the existence of a preliminary fact is disputed, its existence or nonexistence shall be determined as provided in this article." (Evid. Code, § 402, subd. (a).) Defendant asserts that the trial court had a sua sponte duty to conduct a preliminary fact hearing to determine "whether the statement had actually ever been made." He contends that it is not clear whether defendant and Joseph had, in fact, been placed in holding cells next to each other and, if so, why this occurred. Issues regarding a

witness's credibility are properly left to the jury, and are not a proper subject of an Evidence Code section 402 hearing. Whether a "statement had actually ever been made" was for the jury to determine. In any event, defendant did not dispute that he and Joseph had been in adjacent holding cells at trial and provides no authority supporting his contention that the trial court has a sua sponte duty to conduct an evidentiary hearing to determine a preliminary fact.

### 3. Failure to Give Limiting Instruction

Finally, defendant maintains that the trial court should have instructed the jury sua sponte that "[defendant's] alleged statement to [Joseph] was offered for a limited purpose and that they could only rely on the statement if the fact was corroborated."

▆▆▆ Even assuming that defendant is correct in noting that the evidence should only have been admitted for a limited purpose, the trial court had no sua sponte duty to give a limiting instruction. "When evidence is admissible as to one party or for one purpose and is inadmissible as to another party or for another purpose, the court upon request shall restrict the evidence to its proper scope and instruct the jury accordingly." (Evid. Code, § 355.) However, as this court has noted, "absent a request by defendant, the trial court has no sua sponte duty to give a limiting instruction." (*People v. Macias* (1997) 16 Cal.4th 739, 746, fn. 3 [66 Cal.Rptr.2d 659, 941 P.2d 838]; see also *People v. Farnam* (2002) 28 Cal.4th 107, 154 [121 Cal.Rptr.2d 106, 47 P.3d 988].)

### F. Jesse Smith's Assertion of His Fifth Amendment Right in the Jury's Presence

During the guilt phase, the prosecution called as a witness Jesse Smith, defendant's brother. Jesse answered a few initial questions about the night of the murders, responding that he did not remember a night when his brother and a 14-year-old companion came to his house with a safe. At defense counsel's request, a sidebar conference was held, during which defense counsel expressed concern that Jesse might incriminate himself. The trial court appointed separate counsel to represent Jesse. On advice of counsel, when Jesse was called back to testify, he asserted his Fifth Amendment right against self-incrimination and declined to answer any further questions.

Defendant contends that the trial court erred in allowing Jesse to assert his right against self-incrimination in front of the jury, rather than requiring him to exercise the privilege outside of the jury's presence.

This court has noted that "permitting the jury to learn that a witness has invoked the privilege against self-incrimination serves no legitimate purpose

and may cause the jury to draw an improper inference of the witness's guilt or complicity in the charged offense." (*People v. Cudjo* (1993) 6 Cal.4th 585, 619 [25 Cal.Rptr.2d 390, 863 P.2d 635]; see also *People v. Hill* (1992) 3 Cal.4th 959, 992 [13 Cal.Rptr.2d 475, 839 P.2d 984]; *People v. Mincey* (1992) 2 Cal.4th 408, 441 [6 Cal.Rptr.2d 822, 827 P.2d 388].) Indeed, we have noted that " 'it is the better practice for the court to require the exercise of the privilege out of the presence of the jury.' " (*People v. Frierson* (1991) 53 Cal.3d 730, 743 [280 Cal.Rptr. 440, 808 P.2d 1197], quoting *People v. Johnson* (1974) 39 Cal.App.3d 749, 759 [114 Cal.Rptr. 545].) We have commended that approach because it operates "as a means by which to avoid the potentially prejudicial impact of the witness asserting the privilege before the jury." (*People v. Ford* (1988) 45 Cal.3d 431, 441, fn. 6 [247 Cal.Rptr. 121, 754 P.2d 168].) We have, however, stopped short of declaring it error for trial courts to fail to adhere to this practice.[7]

Even if the trial court erred in allowing Jesse to invoke his right against self-incrimination in front of the jury, defendant has failed to preserve this claim on appeal. A defendant may not challenge, for the first time on appeal, the procedure used by the trial court to find a witness unavailable. (*People v. Malone* (1988) 47 Cal.3d 1, 35 [252 Cal.Rptr. 525, 762 P.2d 1249]; *People v. Harris* (1979) 93 Cal.App.3d 103, 118 [155 Cal.Rptr. 472].) Because he failed to object at trial to the witness's invocation of his Fifth Amendment right in front of the jury, defendant forfeited any argument that the manner in which Jesse invoked his Fifth Amendment right was inappropriate.

Assuming arguendo that the claim was not forfeited, defendant has failed to show prejudicial error resulting from Jesse's invocation of his right against self-incrimination in the presence of the jury. Defendant contends that the jurors would speculate as to Jesse's reasons for asserting his right against self-incrimination and would draw inferences unfavorable to defendant. However, the trial court instructed the jury, pursuant to CALJIC No. 2.25, that it was not to draw any negative inferences about defendant from a witness's invocation of the right against self-incrimination.[8]

We presume the jurors followed this instruction: "The crucial assumption underlying our constitutional system of trial by jury is that jurors generally understand and faithfully follow instructions." (*People v. Mickey*

---

[7] Here, of course, Jesse answered several questions about the night of the murders in front of the jury before defense counsel requested the sidebar conference.

[8] At the close of evidence, the trial court instructed the jury: "When a witness refuses to testify to any matter, relying on the constitutional privilege against self-incrimination, you must not draw from the exercise of such privilege any inference as to the believability of the witness or as to the guilt or innocence of the defendant."

(1991) 54 Cal.3d 612, 689, fn. 17 [286 Cal.Rptr. 801, 818 P.2d 84]; see also *People v. Delgado* (1993) 5 Cal.4th 312, 331 [19 Cal.Rptr.2d 529, 851 P.2d 811].) Defendant has failed to persuade us that the instruction in this case was inadequate to prevent any possible prejudice from the alleged error.

## G. *Exclusion of Statement That Joseph Was the Shooter*

Defendant contends that the trial court erred in excluding testimony that would have identified Joseph as the shooter, and that the exclusion of such evidence infringed upon his Sixth Amendment right to present a defense and violated his rights under the Fifth, Eighth, and Fourteenth Amendments.

### 1. *Factual Background*

At trial, defense counsel sought to introduce testimony by Sandra Johnson, Jesse Smith's girlfriend at the time of the crimes. In order to assess the admissibility of Sandra's testimony, the trial court allowed defense counsel to examine her outside the presence of the jury.

On the night of the murders, defendant and Joseph arrived at the apartment shared by Sandra and Jesse Smith. After being awoken by knocking on the door, Jesse left the bedroom to speak with defendant and Joseph. Sandra remained in bed. About 15 minutes later, Jesse returned to the bedroom. About 30 minutes or an hour after he returned to the bedroom, he told Sandra that "Little Man told him that he killed two people. That he killed Michelle and that old man." Joseph was often called "Little Man."

The People objected to the proposed testimony, contending that the statement was multiple hearsay. The trial court sustained the objection, concluding that Jesse's statement to Sandra was not admissible as a spontaneous statement.

### 2. *Hearsay*

In order for Sandra's proposed testimony to be admissible, the hearsay statements of both Joseph and Jesse must fall within an exception to the hearsay rule. "A statement within the scope of an exception to the hearsay rule is not inadmissible on the ground that the evidence of such statement is hearsay evidence if such hearsay evidence consists of one or more statements *each of which* meets the requirements of an exception to the hearsay rule." (Evid. Code, § 1201, italics added; see also *People v. Reed* (1996) 13 Cal.4th 217, 224–225 [52 Cal.Rptr.2d 106, 914 P.2d 184].)

Defendant acknowledges that Sandra's statement regarding Joseph's alleged confession is double hearsay, but maintains that the statement should

have been admitted because two exceptions to the hearsay rule apply. Defendant first argues that Joseph's statement to Jesse was admissible as a statement against penal interest; he then contends that Jesse's statement to Sandra was admissible as a spontaneous statement.

 The trial court excluded Sandra's testimony at least in part based on its conclusion that Jesse's statement to her was not admissible as a spontaneous statement. This conclusion was sound. Evidence Code 1240 provides: "Evidence of a statement is not made inadmissible by the hearsay rule if the statement: [¶] (a) Purports to narrate, describe, or explain an act, condition, or event perceived by the declarant; and [¶] (b) Was made spontaneously while the declarant was under the stress of excitement caused by such perception." "Whether the requirements of the spontaneous statement exception are satisfied in any given case is, in general, largely a question of fact. . . . In performing this task, the court 'necessarily [exercises] some element of discretion . . . .' " (*People v. Poggi* (1988) 45 Cal.3d 306, 318 [246 Cal.Rptr. 886, 753 P.2d 1082], quoting *Showalter v. Western Pacific R. R. Co.* (1940) 16 Cal.2d 460, 469 [106 P.2d 895].) Sandra testified during trial that Jesse did not tell her about Joseph's alleged statement immediately upon returning to the bedroom, but rather told her "about 30 minutes or an hour" later. Thus, the trial court did not abuse its discretion in determining that Jesse's statement did not satisfy the conditions for the spontaneous statement hearsay exception.

Because Jesse Smith's statement was not, as defendant contends, admissible as a spontaneous statement, we need not examine whether Joseph's statement to Jesse was admissible as a statement against penal interest.

### 3. *Jesse Smith's Unavailability*

Defendant contends that he was denied his right to present a defense—that Joseph had admitted to Jesse Smith that he had murdered Dorsey and Martin—because the trial court allowed Jesse to invoke his Fifth Amendment right against self-incrimination when called as a witness for the prosecution. He argues that the trial court erred in allowing Jesse to invoke his right against self-incrimination because Jesse's testimony would not have tended to incriminate him, and that such error violated defendant's Sixth Amendment right to present a defense.

 This claim is not cognizable on appeal because defendant failed to object at trial to Jesse Smith's invocation of his Fifth Amendment right. "[A] defendant who fails to object to a court's permitting a witness to assert the privilege against self-incrimination may not challenge the ruling on appeal." (*People v. Seijas* (2005) 36 Cal.4th 291, 301 [30 Cal.Rptr.3d 493, 114 P.3d

742]; see also *People v. Malone, supra,* 47 Cal.3d at pp. 34–35.) This bar "is but an application of the general rule that questions relating to the admissibility of evidence will not be reviewed on appeal in the absence of a specific and timely objection in the trial court on the ground sought to be urged on appeal." (*People v. Rogers* (1978) 21 Cal.3d 542, 548 [146 Cal.Rptr. 732, 579 P.2d 1048].)

Even had defendant preserved this claim for appeal, it would fail on the merits. Defendant never indicated to the court he wanted to call Jesse *as a defense witness.* Indeed, the court merely ruled that Jesse could invoke his Fifth Amendment right *when called as a prosecution witness.* It is not clear from the record that Jesse would have refused to testify as a defense witness on his brother's behalf. Without more, merely permitting a witness called by the prosecution to invoke the right against self-incrimination does not violate a defendant's right to present a defense.

 Furthermore, even if defendant had called Jesse as a defense witness, and the court had permitted him to invoke his privilege against self-incrimination, the claim would still lack merit. As we have previously held, "It is a bedrock principle of American (and California) law, embedded in various state and federal constitutional and statutory provisions, that witnesses may not be compelled to incriminate themselves." (*People v. Seijas, supra,* 36 Cal.4th at p. 304.) As the United States Supreme Court has stated, this privilege "must be accorded liberal construction in favor of the right it was intended to secure." (*Hoffman v. United States* (1951) 341 U.S. 479, 486 [95 L.Ed. 1118, 71 S.Ct. 814].) In order to assert the privilege against self-incrimination, a witness must have "reasonable cause to apprehend danger from a direct answer." (*Ibid.*; see also *People v. Seijas, supra,* 36 Cal.4th at p. 305.)

In assessing whether the court properly allowed Jesse to invoke the privilege against self-incrimination, we need not decide whether his testimony actually would have incriminated him, but rather whether it would have given him "reasonable cause to apprehend *danger* from the testimony." (*People v. Seijas, supra,* 36 Cal.4th at p. 306.) The questions regarding Jesse's interaction with defendant and Joseph on the evening of the murders clearly would have given him reasonable cause to apprehend danger from answering questions related to his activities on that night.

Here, it was reasonable for Jesse to apprehend a danger of self-incrimination from almost any question related to the events on the night of the murder. He had sheltered defendant and Joseph, helped them open a safe that he knew was stolen, and discussed with defendant the possibility that Martin could "snitch" if he remained alive. In the instant case, because "all

parties—the prosecution, [the witness's] own attorney, and defense counsel—believed that [the witness's] testimony might be self-incriminating, the court correctly concluded that he reasonably apprehended danger if he testified." (*People v. Seijas, supra,* 36 Cal.4th at p. 306.)[9]

 We also reject defendant's contention that, even if the trial court correctly allowed Jesse to invoke his privilege against self-incrimination, his constitutional rights to confrontation and to present a defense "trumped Jesse's right to remain silent." As we have previously held, a defendant's constitutional right to confront witnesses against him does not supersede a witness's constitutional privilege against self-incrimination. (*People v. Hill, supra,* 3 Cal.4th at p. 993.) Furthermore, the absence of Jesse's testimony did not deprive defendant of his ability to present a defense; because Joseph testified at defendant's trial, defense counsel was free to cross-examine Joseph about his alleged confession to Jesse.

We therefore reject defendant's claim that the trial court erred in allowing Jesse Smith to invoke his right against self-incrimination, as well as his claim that the trial court, in so deciding, violated defendant's right to confront witnesses and right to present a defense.

### H. *Conviction for Receiving Stolen Property*

In count 8 of the information, defendant was charged with receiving stolen property in violation of section 496, former subdivision (1), now subdivision (a). The gravamen of count 8 was defendant's possession of Dorsey's gun at the time of his arrest on March 25, 1991. The information also included a firearm enhancement in connection with this count, and specifically alleged that defendant personally used a firearm within the meaning of section 12022.5, subdivision (a). The trial court denied defendant's motion pursuant to section 1118.1 to dismiss count 8 and the firearm enhancement as not being supported by sufficient evidence.

The jury convicted defendant of count 8 and found the firearm-use allegation to be true. The trial court imposed a concurrent two-year prison term on count 8, but struck the firearm-use allegation, finding that there was insufficient evidence supporting the enhancement.

Defendant contends that his conviction for receiving stolen property should be reversed because he was incorrectly convicted of both stealing and

---

[9] Defendant also contends that the trial court had a duty to conduct a hearing to "explore the basis for Jesse's invocation of the Fifth Amendment." However, defendant fails to recognize that all parties here (including defense counsel) agreed after a sidebar conference that Jesse could invoke his privilege against self-incrimination, and provides no authority supporting the contention that the trial court must hold a hearing even when such agreement exists.

receiving the same gun. The People concede that the trial court should have dismissed count 8, and we accept the People's concession.

■■■ Common law has long established that "a person may not be convicted of [both] stealing and receiving the same property."[10] (*People v. Allen* (1999) 21 Cal.4th 846, 852 [89 Cal.Rptr.2d 279, 984 P.2d 486]; see, e.g., *People v. Jaramillo, supra,* 16 Cal.3d at p. 757; *People v. Tatum* (1962) 209 Cal.App.2d 179, 183 [25 Cal.Rptr. 832]; *People v. Bausell* (1936) 18 Cal.App.2d 15, 18 [62 P.2d 774].) The Legislature later codified this principle. (§ 496, subd. (a) ["[N]o person may be convicted both pursuant to this section and of the theft of the same property."].)

In this case, defendant was convicted of both stealing Dorsey's gun and of receiving that gun as stolen property. During defendant's guilt phase trial, the prosecution argued that the robbery charged in count 4 of the information encompassed the taking of Dorsey's gun. The criminal act charged in count 8 was defendant's continued possession of Dorsey's gun at the time of his arrest. Accordingly, defendant's conviction on the charge of receiving stolen property must be reversed.

Defendant additionally argues that his entire guilt phase trial was tainted by his improper conviction for receiving stolen property, and that evidence admitted to prove that count was highly prejudicial to the issues of guilt on the remaining counts, violating defendant's rights under the Fifth, Eighth, and Fourteenth Amendments. In particular, defendant focuses upon the evidence that defendant threatened Darrell Fuller and Jesse Smith with the gun "in a menacing manner" two days after the murders.

However, the evidence that defendant contends was prejudicial to the remaining counts would have been properly admitted in the absence of the charge for receiving the stolen gun. At the guilt phase, the defense centered on a theory that defendant never fired Dorsey's weapon and that Joseph was the gunman. Accordingly, defendant's possession of the gun several days after the murders, as well as his use of it in a threatening manner, was highly relevant to both the murder and robbery charges. As defendant himself notes, his "use of the gun two days later made it more likely he was the actual shooter."

---

[10] There are two limited exceptions to the common law rule: "(1) when the acts of receiving or concealment are completely divorced from the theft, as where the thief disposes of the property and then, in a separate transaction, receives it again, and (2) when the thief is a co-conspirator of the receiver." (*People v. Strong* (1994) 30 Cal.App.4th 366, 371, fn. 5 [35 Cal.Rptr.2d 494], citing *People v. Jaramillo* (1976) 16 Cal.3d 752, 759, fn. 8 [129 Cal.Rptr. 306, 548 P.2d 706].) Neither exception applies here.

Because the evidence admitted in support of the charge of receiving stolen property was admissible to support the remaining charges against defendant, he has failed to show that the trial court's failure to dismiss the charge of receiving stolen property tainted the entire guilt phase trial.

## I. *Juror Misconduct*

After the penalty phase trial resulted in a death sentence, defendant requested that the trial court declare a mistrial based on alleged juror misconduct during the sanity phase of the trial. In support of his motion, defendant presented the trial court with two declarations from Juror Nicole J., as well as a declaration by defendant's investigator relating conversations with other jurors. Defendant contended that several jurors considered defendant's behavior during the sanity phase trial in determining whether he was sane at the time of the offense, which, defendant argues, was improper because the jurors considered information that was not part of the evidence received at trial. The trial court declined to declare a sanity phase mistrial. Defendant now renews his claim, relying upon the juror and investigator declarations submitted in support of his new trial motion. We conclude the mistrial motion was properly denied.

Pursuant to Evidence Code section 1150, subdivision (a), evidence of matters that may have influenced a verdict improperly is inadmissible "to show the effect of such statement, conduct, condition, or event upon a juror either in influencing him to assent to or dissent from the verdict or concerning the mental processes by which it was determined."[11] "This statute distinguishes 'between proof of overt acts, objectively ascertainable, and proof of the subjective reasoning processes of the individual juror, which can be neither corroborated nor disproved . . . . The only improper influences that may be proved under [Evidence Code] section 1150 to impeach a verdict, therefore, are those open to sight, hearing, and the other senses and thus subject to corroboration.' " (*People v. Steele* (2002) 27 Cal.4th 1230, 1261 [120 Cal.Rptr.2d 432, 47 P.3d 225], quoting *People v. Hutchinson* (1969) 71 Cal.2d 342, 349 [78 Cal.Rptr. 196, 455 P.2d 132].) To the extent that portions of Juror Nicole J.'s declarations relate overt acts rather than mental processes,

---

[11] "Upon an inquiry as to the validity of a verdict, any otherwise admissible evidence may be received as to statements made, or conduct, conditions, or events occurring, either within or without the jury room, of such a character as is likely to have influenced the verdict improperly. No evidence is admissible to show the effect of such statement, conduct, condition, or event upon a juror either in influencing him to assent to or dissent from the verdict or concerning the mental processes by which it was determined." (Evid. Code, § 1150, subd. (a).)

and thus may be admissible under Evidence Code section 1150, defendant has nevertheless failed to establish juror misconduct.[12]

Juror Nicole J.'s first declaration, as relevant here, stated: "During the sanity phase deliberations, I brought up in front of the other jurors that Robert Smith was sane in my opinion. I believed this and expressed my thoughts to the jurors that Smith was sane during the time of the trial because of his ability to write questions for his attorney. These points were discussed by other jurors and agreed that his conduct in the [courtroom] was that of a sane man." Her second declaration included the following statement: "During the sanity phase deliberations, I brought to the attention of the jurors, the fact that I believed Smith was sane at the time the crime was committed. I based my decision on the fact that I observed Smith writing notes to his attorneys. When a question was asked of a witness, he would turn and seemed to discuss it with his attorney and have complete understanding of what was happening. I interpreted his courtroom behavior to be the act of a sane person. [¶] During discussions my fellow jurors agreed with me. Other jurors, [whose] names I do not recall, felt as I did, that Smith was sane at the time the crime was committed, because of his behavior during the trial."

Defendant argues that Juror Nicole J.'s discussion with the other jurors about defendant's demeanor during trial was misconduct because it demonstrates that the jury improperly considered information that was not part of the evidence received at trial and relied on this evidence to determine that defendant was sane at the time of the offenses. Defendant asserts the principle that it is misconduct for a prosecutor to comment on a defendant's demeanor off the witness stand in criminal trials of guilt. (See, e.g., *People v. Heishman* (1988) 45 Cal.3d 147, 197 [246 Cal.Rptr. 673, 753 P.2d 629]; *People v. Boyette* (2002) 29 Cal.4th 381, 434 [127 Cal.Rptr.2d 544, 58 P.3d 391].) This rule, however, is not absolute. In *Heishman*, where a defendant presented his character as a mitigating factor during the penalty phase of his trial, we held that it was not misconduct for the prosecutor to refer to his facial expressions because it was proper for the jury to have drawn inferences as to the defendant's character based on their observations of his demeanor. (See *Heishman*, *supra*, 45 Cal.3d at p. 197.) Moreover, defendant cites no authority for the principle that it is misconduct for a *jury* to discuss a defendant's demeanor during a sanity trial.

We need not decide whether, under any circumstance, it may be misconduct for a jury to discuss a defendant's off-the-stand demeanor during sanity

---

[12] The investigator's declaration, stating that four other jurors told him that they considered defendant's courtroom demeanor during the sanity phase trial, contained only "hearsay or statements that violated Evidence Code section 1150, and therefore was of little evidentiary value." (*People v. Schmeck* (2005) 37 Cal.4th 240, 306, fn. 23 [33 Cal.Rptr.3d 397, 118 P.3d 451].)

phase deliberations. Here, a central question during the sanity phase was whether defendant suffered from organic mood disorder, bipolar disorder, antisocial personality disorder, or other cognitive or mental disorders. Defense expert Dr. Woods testified that defendant suffered from "organic mood disorder with features of a manic depressive or bipolar disorder," and that when treated with lithium his behavior improved. He testified also that if defendant were a sociopath or psychopath, no amount of lithium would control his criminal or violent behavior. Defense expert Dr. Blinder testified that defendant is a "classic psychopath," and he suspected "that if we filled this room with lithium carbonate, and administered it to Mr. Smith, it would have no appreciable effect on his conduct." Subsequently, defense counsel, noting that defendant had a level of lithium in his blood within the range that is usually therapeutic, asked Dr. Samuel Benson, also a defense witness, whether defendant's lithium blood level during trial was controlling his mood swings at that time. Dr. Benson responded, "Not from the behavior that I've seen in court today and Friday. Where he's, you know, jollying with people and talking all the time and doing the kinds of things that I ordinarily would consider giving lithium for . . . ." Under these circumstances, where, as prompted by defense counsel, a defense expert expressly analyzed defendant's demeanor during trial, we conclude that it was not misconduct for the jury to discuss his demeanor during deliberations.

### J. Constitutionality of California's Capital Sentencing Scheme

Defendant argues that various features of California's capital sentencing scheme violate the federal and California Constitutions. We previously have considered and consistently rejected these challenges. Because defendant provides no persuasive reason why we should reexamine our capital punishment precedent, we reject these challenges.

California's capital sentencing scheme adequately narrows the class of offenders eligible for the death penalty. (*People v. Stitely* (2005) 35 Cal.4th 514, 573 [26 Cal.Rptr.3d 1, 108 P.3d 182]; *People v. Bolden* (2002) 29 Cal.4th 515, 566 [127 Cal.Rptr.2d 802, 58 P.3d 931]; *People v. Crittenden* (1994) 9 Cal.4th 83, 154 [36 Cal.Rptr.2d 474, 885 P.2d 887].) The special circumstances outlined by the sentencing scheme are not overinclusive in scope. (*People v. Ray, supra*, 13 Cal.4th at p. 356.)

Section 190.2, which lists the special circumstances that narrow the class of murders for which the death penalty can be utilized, adequately provides criteria for identifying and restricting which murders are eligible for the death penalty. (*People v. Demetrulias* (2006) 39 Cal.4th 1, 43 [45 Cal.Rptr.3d 407,

137 P.3d 229]; *People v. Kipp* (2001) 26 Cal.4th 1100, 1137 [113 Cal.Rptr.2d 27, 33 P.3d 450].) Likewise, section 190.3, factor (a), which directs the jury to consider in determining the penalty the "circumstances of the crime," has consistently survived constitutional challenges. (*People v. Stitely*, *supra*, 35 Cal.4th at p. 574; *People v. Bolden*, *supra*, 29 Cal.4th at p. 566.) Consideration of the factors in aggravation outlined by section 190.3 does not invite arbitrary or capricious sentencing. (*People v. Visciotti* (1992) 2 Cal.4th 1, 76 [5 Cal.Rptr.2d 495, 825 P.2d 388].)

A jury is not required to find beyond a reasonable doubt that (1) individual aggravating factors exist (except for other crimes); (2) the aggravating factors substantially outweigh the mitigating ones; or (3) death is the appropriate penalty. (*People v. Avila* (2006) 38 Cal.4th 491, 614 [43 Cal.Rptr.3d 1, 133 P.3d 1076]; *People v. Snow* (2003) 30 Cal.4th 43, 126 [132 Cal.Rptr.2d 271, 65 P.3d 749]; *People v. Kipp*, *supra*, 26 Cal.4th 1100, 1137.) These conclusions are not modified by the recent United States Supreme Court decisions in *Apprendi v. New Jersey* (2000) 530 U.S. 466 [147 L.Ed.2d 435, 120 S.Ct. 2348], *Ring v. Arizona* (2002) 536 U.S. 584 [153 L.Ed.2d 556, 122 S.Ct. 2428], and *Blakely v. Washington* (2004) 542 U.S. 296 [159 L.Ed.2d 403, 124 S.Ct. 2531]. (*People v. Morrison* (2004) 34 Cal.4th 698, 709 [21 Cal.Rptr.3d 682, 101 P.3d 568].)

Moreover, " '[b]ecause the determination of penalty is essentially moral and normative [citation], and therefore different in kind from the determination of guilt,' the federal Constitution does not require the prosecution to bear the burden of proof or burden of persuasion at the penalty phase. (*People v. Hayes* (1990) 52 Cal.3d 577, 643 [276 Cal.Rptr. 874, 802 P.2d 376] . . . .)" (*People v. Sapp* (2003) 31 Cal.4th 240, 317 [2 Cal.Rptr.3d 554, 73 P.3d 433], citation omitted; see also *People v. Bemore* (2000) 22 Cal.4th 809, 859 [94 Cal.Rptr.2d 840, 996 P.2d 1152].)

Further, jurors need not agree unanimously on the existence of particular factors in aggravation. (*People v. Boyette*, *supra*, 29 Cal.4th at p. 466.) "While all the jurors must agree death is the appropriate penalty, the guided discretion through which jurors reach their penalty decision must permit each juror individually to assess" the potential aggravating factors. (*People v. Demetrulias*, *supra*, 39 Cal.4th at p. 41.) "The series of normative judgments involved in deciding whether a particular circumstance is indeed aggravating and, if so, what weight it should be given, cannot be fitted into a scheme of unanimous jury factfinding." (*Ibid.*)

The trial court is not required to instruct the jury that there is no burden of proof at the penalty phase. (*People v. Carpenter* (1997) 15 Cal.4th 312, 417–418 [63 Cal.Rptr.2d 1, 935 P.2d 708].) Nor is there a constitutional requirement that the jury make written findings disclosing the reasons for the penalty determination. (*People v. Fauber* (1992) 2 Cal.4th 792, 859 [9 Cal.Rptr.2d 24, 831 P.2d 249]; *People v. Belmontes* (1988) 45 Cal.3d 744, 805 [248 Cal.Rptr. 126, 755 P.2d 310].) Further, intercase proportionality review is not constitutionally required. (*People v. Lucero* (2000) 23 Cal.4th 692, 741 [97 Cal.Rptr.2d 871, 3 P.3d 248]; *People v. Majors* (1998) 18 Cal.4th 385, 432 [75 Cal.Rptr.2d 684, 956 P.2d 1137].)

The jury may consider unadjudicated offenses as aggravating offenses. (*People v. Sapp, supra*, 31 Cal.4th at p. 316; *People v. Bolden, supra*, 29 Cal.4th at p. 566.) The use of adjectives like "extreme" and "substantial" in the list of potential mitigating factors does not impermissibly restrict the jury's consideration of mitigating factors. (*People v. Harris, supra*, 37 Cal.4th at p. 365; *People v. Smith* (2002) 30 Cal.4th 581, 642 [134 Cal.Rptr.2d 1, 68 P.3d 302].) Finally, neither the federal nor the state Constitution requires the trial court to instruct the jury that section 190.3's statutory mitigating factors are relevant solely as potential mitigating factors, and not as aggravating factors. (*People v. Sanders* (1995) 11 Cal.4th 475, 564 [46 Cal.Rptr.2d 751, 905 P.2d 420].)

Defendant's arguments that California's death penalty law deprives capital defendants of equal protection are not persuasive. As stated above, we have established that intercase proportionality review, jury unanimity on aggravating circumstances, written findings disclosing the reasons for the penalty determination, and a requirement that the prosecution bear the burden of proof or burden of persuasion at the penalty phase are not constitutionally required. (See *People v. Lucero, supra*, 23 Cal.4th at p. 741; *People v. Boyette*, 29 Cal.4th at p. 466; *People v. Fauber, supra*, 2 Cal.4th at p. 859; *People v. Sapp, supra*, 31 Cal.4th at p. 317.) A successful equal protection claim must show that " ' "the state has adopted a classification that affects two or more similarly situated groups in an unequal manner." ' " (*People v. Massie* (1998) 19 Cal.4th 550, 571 [79 Cal.Rptr.2d 816, 967 P.2d 29].) "[B]y definition, a defendant in a noncapital case is not similarly situated to his capital case counterpart for the obvious reason that the former's life is not on the line." (*People v. Superior Court (Sturm)* (1992) 9 Cal.App.4th 172, 185 [11 Cal.Rptr.2d 652].)

Finally, "[i]nternational law does not compel the elimination of capital punishment in California." (*People v. Snow, supra*, 30 Cal.4th at p. 127.)

## III. DISPOSITION

Defendant's conviction for receiving stolen property (§ 496, former subd. (1), now subd. (a)) is reversed, and the judgment otherwise is affirmed.

George, C. J., Kennard, J., Baxter, J., Werdegar, J., Chin, J., and Corrigan, J., concurred.

Appellant's petition for a rehearing was denied April 11, 2007. George, C. J., did not participate therein.