Filed 10/7/13  P. v. Vance CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>ANDREW JAMES VANCE,<br><br>    Defendant and Appellant. | A134605<br><br>(Alameda County<br>Super. Ct. No. H43194A) |

In 2010, this court reversed the first-degree murder conviction of Andrew James Vance because of egregious and pervasive prosecutorial misconduct.  (*People v. Vance* (2010) 188 Cal.App.4th 1182 (*Vance I*).)  The only other point we addressed, because it "may arise on trial"—and it did—was whether certain of defendant's post-arrest custodial statements were obtained in violation of *Miranda v. Arizona* (1966) 384 U.S. 436.  We agreed with the trial court that they were not.

Defendant was promptly retried, and his statements were again determined to be admissible, on precisely the same terms as in the first trial.  The jury found defendant guilty of second-degree murder, and he was sentenced to state prison for the term prescribed by law for that offense.

Vance presents two claims of error:  (1) the trial court erred in concluding that, notwithstanding finding that some of defendant's custodial statements would be excluded as taken in violation of *Miranda*, the court did not conclude that all of defendant's subsequent statements were tainted by that violation; and (2) the trial court abused its discretion when it removed a juror shortly before deliberations commenced.  We

1

conclude that neither of these claims establishes the need for a third trial, and therefore affirm.

## BACKGROUND

The parties' briefs demonstrate that they have no substantive disagreement about the details of the retrial record, which mirrored that of the original trial. Moreover, neither of the contentions defendant now advances is dependent on the trial record. We therefore adopt what we said in *Vance I*:

"Except in one particular, the jury was not presented with material conflicts in the evidence, only the strength of the incriminating conclusion to be drawn from the largely undisputed testimony and trial exhibits.

"It appears accepted that the victim, Dipak (Deuce) Prasad, died on June 2, 2006. It further seems that it all began with Prasad telling defendant's girlfriend, Jennifer Delong, that he, defendant, was sleeping with another woman. Delong confronted defendant with this report, and its source, and left town, much to defendant's distress.

"On the afternoon of June 2, defendant confronted Prasad about what he, Prasad, had told Delong. Prasad thought what he told defendant had defused defendant's anger. The two thereafter spent several hours getting and consuming methamphetamine, all the while Prasad unaware that defendant was bent on revenge.

"Defendant intended to teach Prasad a lesson with a beating. His friend Kevin West agreed to assist.[1] Defendant and Prasad met up with West, and, with Prasad driving his Lexus, they then went to Ronnie Pedrosa's auto shop. Pedrosa, who had been in prison with defendant and West, had also agreed to help with the beating of Prasad. They all ingested some methamphetamine provided by Prasad. Pedrosa had to beg off participating in the beating because he had to take care of a friend's children.[2] Before

---

[1] "West, who first met defendant while they were both incarcerated, was originally a codefendant, but prior to trial pleaded guilty to the reduced charge of manslaughter. West agreed to accept a prison term of three years and to testify at defendant's trial."

[2] "While incarcerated with defendant several months prior to the victim's death, Pedrosa heard defendant say that he wanted to 'take care of' someone, but he did not

the group left, and without telling either West or Pedrosa, defendant took some black plastic 'zip ties' from Pedrosa's shop.

"Prasad drove defendant and West in Prasad's Lexus to a friend's house, where they had more methamphetamine. They then drove to Palomares Canyon, looking for an address where defendant said they could get more methamphetamine. Palomares Canyon is located in an area that is not densely populated, and only poorly and intermittently lighted.[3] The canyon has a creek at its bottom, approximately 75 feet down a steep incline from Palomares Road. It was about midnight.

"Stopping in a driveway, the three got out of the Lexus. Defendant then put Prasad in a choke hold and rode him down to the ground; this occurred in a period West estimated as 30 to 90 seconds. According to West, Prasad 'went limp' and began making snoring sounds. According to both West and defendant, neither of them ever kicked or punched Prasad, or hit him with any kind of object.

"West testified that he and defendant then bound Prasad's hands and feet, West using a shoelace from one of Prasad's shoes to 'tie up' his legs; they then put him in the

name the person he meant. After both were released, Pedrosa agreed to let his garage be used as the 'place to take care of' Prasad, who was not identified as the subject of their previous conversation. When asked what 'take care of' meant, Pedrosa ventured that it meant defendant 'wanted to hurt' Prasad. Pedrosa further testified that he did not take defendant seriously. Defendant testified that he did not know of the victim while he was incarcerated with Pedrosa, so could not have told Pedrosa that he intended to 'take care of' Prasad.

"According to defendant, he told Pedrosa 'the same thing I told Kevin' about the justification for the beating. Defendant testified that it was Pedrosa who raised the possibility of going further than a beating. Defendant rejected this because 'I didn't want to kill [Prasad], I just wanted to beat him up.' His original plan was for the beating to occur at Pedrosa's shop, but this had to be changed 'because the two little girls were there.' When West suggested at the shop that 'we hit [Prasad] over the head and put him in a barrel or something, I told him no, that I didn't want to do that because I wasn't trying to kill him or nothing, I was just trying to scare him.'

3 "Defendant did admit that it was his idea to take Prasad to Palomares Canyon because 'we didn't know where we were going to beat him up because we didn't want to do it . . . where somebody would see.'

3

trunk of the Lexus. Before Prasad was put in the trunk, West heard the sound of adhesive tape being unrolled. Defendant and West drove a short way to a more isolated part of the canyon. According to West—who described Prasad as being unconscious but still snoring—he and defendant threw him down the embankment of the canyon. Defendant followed this by throwing Prasad's shoe, presumably the one from which the lace had been removed, down the embankment.

"Defendant testified that he put Prasad in a headlock for 20 to 30 seconds. He did not intend to actually choke Prasad, only 'to restrain him . . . [¶] so Kevin could tie him up.' 'It was just [a] spur of the moment' decision. Defendant did not know that a choke hold could be life threatening. Defendant let go of Prasad when 'he wasn't resisting anymore' and 'started to . . . breathe funny,' emitting 'like a snoring sound.' Defendant thought 'I just rendered him unconscious,' and Prasad 'just passed out,' because he was breathing and making the snoring sounds.

"Defendant's version was that his plan was not to take Prasad into Palomares Canyon to kill him, just to beat him up, and then 'leave him there, teach him a lesson,' and take his car. According to defendant, West was the only one who took tape—black electrical tape—into Palomares Canyon, and the only one who did any binding of Prasad's hands and feet; it was West who fastened the zip ties on Prasad's hands, put his hands behind his back, and pinioned Prasad's feet with 'black electrical tape and [a] shoelace.' Defendant kept hold of Prasad, whose body was 'wiggling a little bit.' When he and West took Prasad out of the trunk of the Lexus, Prasad was not moving, but he was 'still breathing' and 'still snoring.' 'Then we . . . placed him on the side of the road.' Prasad was not thrown into the ravine. And it was West who threw Prasad's shoe into the ravine.

"Defendant and West then returned to Pedrosa's shop in Prasad's Lexus. According to West, defendant asked if Pedrosa 'had any tools for digging,' and whether he knew anyone who might want to buy the Lexus. Defendant told Pedrosa that he had 'choked him [Prasad] out' and then " 'threw him off the cliff.' " Pedrosa was not sure if defendant was serious or merely bragging. Defendant later told Delong the same thing.

4

Defendant denied making any statement about tools. He did tell Pedrosa and Delong that he had thrown Prasad over the cliff, but he also told them that Prasad was alive when he was left in Palomares Canyon.

"According to Pedrosa, a day or two later, he and defendant were driving in Palomares Canyon, and at one point defendant said something to the effect that he wondered whether Prasad 'would climb back up from where [defendant] threw him off.' Defendant drove the Lexus for several days, and later sold it in Fresno. Although Delong initially did not believe defendant's statement of what he did to Prasad, she came to believe it when defendant sold the Lexus, and after she received a telephone call from Prasad's sister trying to locate him. That same call apparently started defendant thinking that Prasad 'might not be alive anymore' because 'it's been so many days and he has not turned up.' At that point defendant 'was thinking that he might be deceased.'

"Things started unraveling on June 12, when Pedrosa was arrested for a parole violation, and he raised the subject of Prasad's situation in hope of receiving 'some consideration.' Under police guidance, Pedrosa made a number of recorded telephone calls to defendant in which defendant indicated awareness that Prasad's body was still in Palomares Canyon, and that the restraining zip ties should be removed. Pedrosa also arranged a meeting with defendant at which defendant was arrested.

"Prasad's body was found partially submerged in the creek of Palomares Canyon, with his hands tied behind his back 'in an unnatural position' with black plastic zip ties. Both tennis shoes and socks were found nearby. A shoelace from one of the shoes was found attached to duct tape.

"Due to decomposition and/or animal mutilation, forensic pathologist Dr. Thomas Rogers testified that the cause of death could not be pinpointed. The autopsy revealed no signs of bone fractures or blunt force trauma on the body. Dr. Rogers further testified a person can die of asphyxiation from a choke hold minutes after being released, and during this period the victim may appear unconscious or make noises such as wheezing, gasping, or snoring. Moreover, the duration of a choke hold resulting in death 'can be just a few seconds or it can be upwards to minutes.'

5

"Defendant and West were arrested on June 13. The next day, defendant gave a lengthy statement to detectives Norton and Kelly, and then a shorter statement to an assistant district attorney. In his statement, and in his testimony at trial, defendant admitted that he was angry at Prasad because of what Prasad had told his girlfriend; that what Prasad said was true, even if motivated by sexual jealousy; that he did put a choke hold on Prasad; that Prasad was alive when he and West left, and he had no intent to cause Prasad's death; and that he and West left Prasad by the side of the road, and did not throw him down the embankment." (*Vance I*, *supra,* at pp. 1188-1192, some fns. omitted.)

## REVIEW

### The Trial Court Did Not Err By Refusing To Exclude The Entirety of Defendant's Post-Arrest Statements

Our discussion of the *Miranda* issue in *Vance I* was as follows:

"Only one of the other contentions made by defendant deals with a matter that may arise on retrial.

"Defendant was arrested on June 13. He was first interviewed by officers, and four and one-half hours later by an assistant district attorney.

"Prior to trial, defendant moved to suppress evidence of statements he made in the two interviews because his statements were elicited in violation of *Miranda v. Arizona, supra,* 384 U.S. 436. Following an evidentiary hearing pursuant to Evidence Code section 402, the court ruled that evidence of an initial interview by officers at the San Leandro police station on June 13 would be excluded as elicited in violation of *Miranda,* but that the second interview by the district attorney would be admissible. Defendant contends the second interview was tainted by the first because his invocation of his right to silence was ignored, and the statement was involuntarily induced by an improper promise of leniency. The contention is without merit.

6

"Defendant was arrested at approximately 4:00 p.m. His videotaped interview with Officers Norton and Kelly began about 70 minutes later. After some orienting preliminaries, the following occurred:

" 'NORTON: All right first of all you have the right to remain silent. Do you understand that?

" 'VANCE: Yeah.

" 'NORTON: Anything you say can and will be used against you in a court of law. Do you understand that?

" 'VANCE: Yep.

" 'NORTON: Uh, you have the right to talk to a lawyer and have him present while you are being questioned. Do you understand that?

" 'VANCE: Yep.

" 'NORTON: If you cannot afford to hire an attorney, one will be appointed to represent you free of charge before any questioning if you wish one. Do you understand each of these rights I have explained to you?

" 'VANCE: Yeah.

" 'NORTON: Okay, why don't you tell me your side of the story?

" 'VANCE: I don't have a side of the story.

" 'KELLY: We just found Deuce's body in the creek in Palomares. His decomposed body. Alright, and we have already finished interviewing four different people, and we know what time it is.

" 'NORTON: Here is your opportunity to sit with us and tell us exactly what happened, because, like Ray said, we have already talked to a couple of different other people, we have already got Deuce's body, and we know what time it is. We need to hear exactly what happened from your perspective, why it happened, what motivated you, you know what I mean? What really happened, you know . . .

" 'KELLY: It was probably an accident or something bad happened. I don't know, but we need to find out.

" 'NORTON: But you just sitting here saying you don't know what we are talking about when we know you do. You know what I mean. You need to be honest with us, be honest with yourself. What happened?

" 'KELLY: Did you drive out with Deuce and Kevin West out to into Palomares? That's a yes or no, dude? We just . . .

" 'NORTON: Are you not going to talk to us, is that what you are doing?

" 'VANCE: No, I'm talking to you guys.

" 'NORTON: It's a simple question. Did you drive out there with Deuce and Kevin?

" 'KELLY: Look, dude, we're not here to . . . we just want to find the truth out, alright? We just want to hear your side of the story, how things went down, okay? We know Deuce is dead. That's fine, okay, and we are not sitting here saying you're some kind of crazy serial killer or something like that. Some bad shit happened. We just want to figure out what happened so we can tell Deuce's family, okay? Alright dude, we don't think anything of you, we're not here to judge you. We know it wasn't supposed to go down that way and it did you know what I mean. Something went down. It wasn't supposed to go that way, but it happened, bro, and now we have to get to the bottom of it, figure this shit out man, you know? I know you are upset man, but let's get through this together all right? We're not here to fuck with you, man.

" 'NORTON: It takes a big man to be honest all right and I know you have that in you all right. It takes a big man to be honest.

" '[VANCE begins crying.]

" 'KELLY: Dude, it's okay, bro, alright. It's alright, bro. We're not here to mess with you, all right. We are here to listen and then to help you out.

" 'VANCE: (crying) That's what everybody always tells me and then I end up getting fucked.

" 'KELLY: Well, we're not here to do that bro, we're just here to find out the truth about what happened. And I think you have a lot on your chest right now, and I think you need to talk about this, I know you want to talk about this.

" 'NORTON: This has been weighing on you for the last two weeks.

" 'KELLY: The last two weeks have been fucked.

" 'NORTON: Tell us what happened. Come on Drew, what happened, buddy.

" 'KELLY: Keep it real with us Drew. Man we're not going to sit here and judge you, buddy.

" 'VANCE: (crying) It doesn't matter anyway I'm just going to go to prison and rot and never come out of there.

" 'NORTON: Drew, this is the thing, buddy. We need to know your side of the story. We need to know what happened. What happened out there, Drew? Tell us what happened out there.

" 'VANCE: It was an accident."

All of this took four minutes.[4]

"Approximately three and one-half minutes later, Norton asked, 'What happened once you guys got there, Andrew?' Defendant replied, 'I don't want to talk about it.' When, approximately four minutes later, Norton again asked, 'So what happened when you guys . . . got out there Andrew?' defendant responded, 'I don't want to talk about it. I'm just a bad person.'

"The trial court ordered evidence of this interview excluded, but stated, 'my ruling is very limited. I'm going to find that there was not a valid waiver of *Miranda* in this case.' The court further found that defendant had not invoked his right to silence under the Fifth Amendment or his right to counsel under the Sixth Amendment. The court then reiterated that 'The sole basis of exclusion is that I do not find, once again, that there was a clear waiver of his Fifth Amendment right[ ] and that is why I'm excluding it.' The court rejected defendant's arguments that the district attorney interview was tainted by the first interview, and likewise was not preceded by an effective waiver.

" 'In reviewing *Miranda* issues on appeal, we accept the trial court's resolution of disputed facts and inferences as well as its evaluations of credibility if substantially

---

4 "As measured by the timer on the videotape, which we have watched."

supported, but independently determine from the undisputed facts and facts found by the trial court whether the challenged statement was legally obtained.' (*People v. Smith* (2007) 40 Cal.4th 483, 502.) Whether defendant invoked his rights under *Miranda* is a question of fact to be resolved on the basis of the totality of the circumstances. (*People v. Musselwhite* (1998) 17 Cal.4th 1216, 1238; *People v. Hayes* (1985) 38 Cal.3d 780, 784-785.) Defendant contends his 'I don't have a side of the story' and 'I don't want to talk about it' statements must be treated as invocations of his *Miranda* rights.

"But invocations cannot be equivocal or ambiguous. (*Berghuis v. Thompkins* (2010) 560 U.S. 370, 130 S.Ct. 2250, 2259–2260, see *People v. Crittenden* (1994) 9 Cal.4th 83, 129 ['we apply federal standards in reviewing a defendant's claim that his or her statements were elicited in violation of *Miranda*'].) Having viewed the tape, and reviewed the testimony given in connection with defendant's suppression motion, we conclude that there is substantial evidence from the totality of the circumstances supporting the trial court's implicit finding that neither statement constituted an unequivocal invocation.

"Although the premise of *Miranda* is that custodial interrogation is deemed inherently coercive (e.g., *United States v. Patane* (2004) 542 U.S. 630, 639), defendant was hardly a terrified novice. When the interview session started, even before the *Miranda* warnings were given, defendant was asking whether he could speak with another officer with whom he had had prior dealings. He faults the officers for not asking questions to clarify whether he was invoking his rights, but they did precisely that: when Norton early on asked, 'Are you not going to talk to us, is that what you are doing?' defendant replied, 'No, I'm talking to you guys.' Defendant's 'I don't have a side of the story' statement strikes us as, at best, inherently ambiguous. It obviously could mean that he had no explanation ('story') that was exculpatory.

"Defendant's claim that his first statement was the product of the officers' implied promise of 'help'—which defendant equates with leniency—is to be reviewed according to well-established standards: 'The federal and state Constitutions both bar the use of involuntary confessions against a criminal defendant. [Citations.] A confession is

10

involuntary if it is "not ' "the product of a rational intellect and a free will" ' " [citation], such that the defendant's "will was overborne at the time he confessed." [Citation.] In assessing allegedly coercive police tactics, "[t]he courts have prohibited only those psychological ploys which, under all the circumstances, are so coercive that they tend to produce a statement that is both involuntary and unreliable." [Citation.] Whether a statement is voluntary depends upon the totality of the circumstances surrounding the interrogation." (*People v. Smith, supra,* 40 Cal.4th 483, 501.) ' "The question posed . . . in cases of claimed psychological coercion is whether the influences brought to bear upon the accused were 'such as to overbear petitioner's will to resist and bring about confessions not freely self-determined.' [Citation.]" [Citation.]' (*People v. Thompson* (1990) 50 Cal.3d 134, 166.)

"Concededly, defendant was crying during the first 10–15 minutes, prompting one of the officers to urge defendant to 'Take a couple of deep breaths and try to compose yourself.' It worked, if only temporarily. Defendant resumed crying when confronted with a picture of the victim. While defendant reads an implied promise of leniency into Officer Kelly's statement that 'we are here to listen and then to help you out,' and Officer Norton's statement that 'the court . . . wants to know what the real story is and you're the only one that can provide that,' our review of the videotape reveals that the only benefits promised by the officers was the peace of mind defendant and others would have after he did the right thing and gave his side of the story. That is not coercion. (E.g., *People v. Williams* (2010) 49 Cal.4th 405, 444; *People v. Boyde* (1988) 46 Cal.3d 212, 238 ['Mere advice or exhortation by the police that it would be better for the accused to tell the truth, when unaccompanied by either a threat or a promise, does not . . . make a subsequent confession involuntary']; *People v. Jimenez* (1978) 21 Cal.3d 595, 611–612 [' "[when] the benefit pointed out by the police to a suspect is merely that which flows naturally from a truthful and honest course of conduct," the subsequent statement will not be considered involuntarily made']; *People v. Andersen* (1980) 101 Cal.App.3d 563, 578.) The brief and bland references upon which defendant has seized do not push this case over the forbidden line of promised threats or vowed leniency (see *People v. Ray* (1996)

11

13 Cal.4th 313, 340), certainly not within the context of an interview that lasted more than three hours.

"Certainly defendant experienced stress. It may have been realization of the seriousness of his situation, or remorse at what he had done.[5] Defendant's repeated and resigned expressions that "in the end it really doesn't matter,' and 'What does it matter I'm . . . going to prison for the rest of my life,' betrays a deep pessimism about the criminal justice system. Even if defendant in good faith was insisting that he left Prasad alive, he was now confronted with the reality that the choking of Prasad had led to his death. Undoubtedly, officers Norton and Kelly used planned techniques, interrogation ploys, and even mock flattery ('It takes a big man to be honest,' 'You're doing the right thing. I'm proud of you,' 'you were very honest with us'), during the course of the interview. Yet, there are long periods of unforced lucidity by defendant. If defendant is not particularly forthcoming with volunteered details, he nevertheless follows questions posed, and generally provides answers, even if the question has to be reiterated. The questioning is insistent, but not intrusive or overbearing. There is a break of almost 40 minutes when defendant is left alone in the interview room. Defendant's body language was not cowering. Defendant was wearing handcuffs only until the interview was about to begin, when they were removed. He was able to assert himself and challenge the logic of the officers assumption, i.e., 'I don't care what you think,' 'what I think you're doing right now, you're analyzing too much,' 'I don't care if you believe me

---

[5] "When initially offered a photograph of the victim, defendant insisted that 'I don't want to see him, please don't show it to me.' When later forced to look at the photograph, defendant once more broke down in tears, insisting, 'I don't want to be alive no more.' And even later in the interview, when Officer Norton made reference to the photograph of Prasad, defendant insisted, 'I don't want to see it again.' At that point Officer Kelly bluntly told defendant that Prasad 'died at the hands of another and those hands were yours, and you have to face up to that, you killed another human being, you killed somebody,' and then Prasad's 'family that's never going to see him again, they don't even know yet . . . that he's dead . . . . What am I going to tell his mother cause him [Norton] and I are going to tell his mother. What do we tell her? Give me an idea, here, man. You know how hard that is to do?' "

or not.' And, ultimately, the officers failed on the crucial point—defendant doggedly insisted Prasad was alive when he left, and he adamantly denied that he pushed Prasad off the road and down the canyon ravine.

"Granted, defendant made statements after June 2 that were recorded, and which will bear an incriminating inference. The general import of the statements is that a week after June 6—after he knew that Prasad was thought missing by his family, who were trying to locate him—defendant either assumed or knew that Prasad's body was still in Palomares Canyon, and that it would have the zip ties which should be removed. However, the inference that defendant now knew Prasad was dead, is still not inconsistent with the defense theory that there was no murderous intent on the night of June 2. In other words, defendant could have concluded that his actions did result in Prasad's death, but this does not demonstrate that the death was intentional.

"In light of the foregoing, we conclude the trial court's pretrial ruling cannot be overturned on the basis of the record as it now exists. However, in the event of a retrial, the trial court is at liberty to reexamine this ruling in light of any new information that may be brought to its attention." (*Vance I*, *supra,* at pp. 1207-1214.)

In advance of the retrial, defendant again moved to suppress all evidence of his custodial statements. The trial court conducted a brief evidentiary hearing and, in plain effect, consciously reiterated the same ruling made at the first trial—evidence from the initial interview would be excluded under *Miranda*, but evidence from the second interview could be used because "it wasn't tainted" by the *Miranda* violation. Just as he did on the first appeal, defendant contends that, given the conceded *Miranda* violation, exclusion of the ensuing statement is logically required. We do not agree, both on the merits, and by reason of a rarely applied appellate principle.

The idea of the doctrine of the law of the case was first mentioned by counsel in preparation for the suppression hearing following our reversal in *Vance I*. After reviewing the transcript of the ensuing hearing, the possibility of applying the doctrine appeared sufficiently well-grounded that we had counsel provide supplemental briefing on the issue.

13

Simply put, the doctrine of the law of the case provides that once an appellate court passes upon an issue, its decision on that issue remains binding throughout subsequent proceedings.  The classic modern formulation of the doctrine is in *People v. Shuey* (1975) 13 Cal.3d 835, 841:  " '[W]here an appellate court states a rule of laws necessary to its decision , such rule " 'must be adhered to' " in any " 'subsequent appeal' " in the same case, even where the former decision appears to be " 'erroneous.' " ' " (*People v. Whitt* (1990) 51 Cal.3d 620, 638, quoting *Shuey*.)  "Thus, the law-of-the-case doctrine 'prevents the parties from seeking appellate reconsideration of an already decided issue in the same case absent some significant change in circumstances.' " (*People v. Boyer* (2006) 38 Cal.4th 412, 441, quoting *People v. Whitt*, *supra*, at p. 638.)  Moreover, " '[a] decision on a matter properly presented on prior appeal becomes the law of the case even though it may not have been absolutely necessary to the determination of the question whether the judgment appealed from should be reversed.  [Citations.]' [Citation.]  Thus, application of the law-of-the-case doctrine is appropriate where an issue presented and decided in the prior appeal, even if not essential to the appellate disposition, 'was proper as a guide to the court below on a new trial.' [Citation.]" (*People v. Boyer*, *supra*, at p. 442.)

"On the other hand, the law-of-the-case doctrine governs only the principles of law laid down by an appellate court, as applicable to a retrial of fact, and controls the outcome on retrial only to the extent the evidence is substantially the same." (*People v. Boyer*, *supra*, 38 Cal.4th 412, 442.)  "Where, on remand, 'there is a substantial difference in the evidence to which the [announced] principle of law is applied, . . . the [doctrine] may not be invoked.' " (*People v. Barragan* (2004) 32 Cal.4th 236, 246.)

The records of the two suppression hearings are not identical.  Only Officer Norton testified at the first hearing, and only Officer Kelly testified at the second.  However, Officer Kelly testified that defendant's "entire interaction with myself and Sergeant Norton and the members of the District Attorney's Office was all recorded.  The only time it was recorded was when he left that room and then was subsequently transported to jail."  In other words, the only relevant evidence is the tape.  We watched

14

that tape on *Vance I* (see fn. 4, *ante*) and the trial court watched it at the second suppression hearing.

Thus, the relevant evidence is indeed "substantially the same." (*People v. Boyer*, *supra*, 38 Cal.4th 412, 442.) Although the trial court was inclined to conclude that no *Miranda* violation occurred at the first interview, it took some pains to make sure that its ruling conformed to the earlier ruling. So, the second ruling, based on virtually the same evidence as the first, is in effect the same one we reviewed on *Vance I*. It is therefore covered by the law of the case we articulated in our prior opinion.

And as a separate and independent ground for rejecting defendant's contention, our second viewing of the tape produces the same conclusion we reached in *Vance I*: there was no error, including no coercion, the contention belatedly made by Vance here.

### The Trial Court Did Not Abuse Its Discretion
### When It Removed A Juror

On the final day of testimony, after the lunch recess and out of the jury's presence, the court addressed counsel with a matter about one of the jurors. Because the information came from Erin Osanna, a "victim witness person" for the District Attorney's office, the court asked the prosecutor to "put it on the record." The prosecutor responded:

"Ms. Osanna was standing outside the courtroom, in the main hallway, . . . along with Geeta Devi.[6] While they were outside, they saw the husband of one of our jurors walk out of the courtroom . . . . [¶] . . . [¶] As Ms. Osanna was outside with Ms. Devi, the husband of this juror was approached by the gentleman seated in the courtroom right now with the sunglasses on his head. He's wearing a black T-shirt. He has sleeved tattoos on his arm. He has a goatee."

The man was identified as Robert Garris, the fiancé of defendant's mother, who told the court "We just asked how his [the juror's] son was doing." The court stated, "So,

---

[6] Who was the victim's sister.

Mr. Garris has acknowledged to the Court he had contact with the husband of the juror, and apparently it was—they had some baseball or family connection."

The prosecutor then resumed his narrative: "At that point, the juror—I believe it's Juror No. 5[7] . . . came out of the jury room and approached her husband, and there was some kind of acknowledgement between Mr. Garris [and] her husband. The three of them had an acknowledgement of knowing each other. Then they walked toward the elevator bay together. Ms. Osanna did not hear the extent of the conversation, but she did see the three of them walking towards the elevator. What she did hear was Mr. Garris say that he is the defendant's stepfather."

Ms. Osanna then took the stand and briefly (one paragraph in the reporter's transcript) verified the prosecutor's narrative. Defendant's counsel declined to examine Ms. Osanna. The following then occurred:

"THE COURT: . . . [¶] . . . [¶] Now I've heard the information. Mr. Garris, no one is saying you did anything intentional, because it appears to me what happened here was somewhat inadvertent. The juror's husband had actually been here—this is probably his third day, at least here in the courtroom. However, I have to take a look at this case from the standpoint—this case has been mistried once. There's been a reversal on this case. And I'm very cautious whenever we have incidents where there's contact with jurors, juror's family, even though it may be inadvertent. But it's too important to both sides to get a fair trial, and the actual perception that, in fact, people are being treated fairly and there's nothing that may disturb the process of deliberations. Now, potentially—I don't know. We have a potential [for] . . . communications potentially with a witness. I don't know if you were going to call Mr. Garris later on. I don't know

---

[7] As will be seen, the excused juror is sometimes identified as "Juror No. 23." The Attorney General explains "the discharged juror was juror number 23, in jury slot five." This seems logical, so, to avoid confusion, for purposes of simplicity, all references to the juror will identify him/her as "Juror No. 5." In any event, there is no dispute that it was the juror who was removed and whose removal is now challenged by defendant.

16

what the relationship—the juror—I don't know what happened there. We might have communications with a third party in the case.

"People live in relationships. People talk. And I'm not certain if it's not going to happen, whether sitting at the table and they begin deliberations, that Juror No. 5 and her husband start talking about the influence and the impact that relationship may have. And the fact that you have told us there's this contact where the kids have played baseball together and they know and acknowledge each other, that's more than slight. So I think that you've got a setting where there's potential for bias or prejudgment of the case or prejudice against one party. You potentially have the consulting of extraneous materials, i.e., maybe a discussion, like I said, with the spouse about information that he may have obtained about the background of the family. I mean, there are many potential issues as it relates to that. And I don't know if she knew—the actual juror knows Christopher's mom's fiancé. I don't know. But that—there's just too many things going on here. And although I say that's probably inadvertent, because I'm not certain—I'm not saying that Mr. Garris did anything intentionally. But the jury has been exposed to information that other jurors would normally not have been exposed to, and I—under these circumstances, I make a finding that there's good cause here, and I am going to excuse Juror No. 5. I'm going to ask her to be brought out, Madam Clerk, so I can talk with her in this matter.

"Counsel, you want to make a record? Is there anything else you want to say?

"MR. INFANTE [the prosecutor]: I'm going to ask Mr. Garris be barred from the courtroom for the rest of the trial. This is the second time this has happened, where's he's had contact with someone in connection with the trial. We had Mr. Pedrosa's testimony about Mr. Garris calling him a snitch outside this courtroom, and now we have this contact. He's poisoned the well at this joint, now he knows that his contact—if he contacts a juror, that the juror will be kicked off. And if he knows the consequences of that, he can continue to contact jurors at will at this point. I'm asking that he be barred for the pendency of this trial. I know this is an open proceeding and I know the law has very strict limitations on who can be banned from courtrooms because this is an open and public hearing, but at this point, Mr. Garris has crossed the line twice in trying to

17

somehow connect himself to participants or influence participants, specifically Mr. Pedrosa. So I believe he should be barred for the rest of the trial.

"THE COURT: All right. You motion—your request has been heard and it's denied. I don't think he intentionally did anything. And you know, Mr. Garris—I've told you, look, anything else even slight, you're going to be out of this courtroom, because there will be enough taint. Under the circumstances, as Ms. Osanna testified, I don't think it was intentional. I think it was inadvertent in respects. But the information that—the fact that the husband of the juror knows that you are—the defendant is [your] potential stepson or the fact that his wife is there, walked with each other going to the elevator, that's too much to bear.

"So Mr. Mann, would you like to be heard?

"MR. MANN [defense counsel]: Well, not on that issue, but I do have a request, your Honor, that in light of your Honor's indication that you are inclined to or planning to excuse this particular juror who is involved in this issue, I don't believe that is appropriate unless and until the juror himself herself was questioned and she indicated that there was some sort of inappropriate contact or discussion about the case or perceived threat or anything of that nature, because I think that what we have here is what Mr. Garris said, was that he said hello to the man he recognized, and while he was speaking to him out in the hallway, a nonjuror, that juror's wife, came out and joined them on her own volition. And unless there was some inappropriate contact thereafter, I don't think that that would be just cause to relieve this juror and I would object.

"THE COURT: Well, I have two contacts. I have one coming out of the hallway and the introduction saying this is the defendant's stepfather, whatever, and then I get them walking out together in the elevator together. Now, that's more than just casual contact. But I'm going to bring her out and I'm going to—I will question her to the extent you think you need to. But there's no question in my mind. I'm not going to allow this type of conduct, even if it's inadvertent and to the extent that we have discussions going on with parties to the case that have a self-interest. So let's have her come out. That's Juror No. 5.

18

"(Pause.)

"THE COURT:  My Juror No. 5.

"JUROR NO. 5:  Hello.

"THE COURT:  I brought you in here because it'd been brought to the Court's attention that apparently your husband knows and has had contact this morning with the defendant's mother.  And, actually, I guess they're engaged.

"JUROR NO. 5:  Not with the mother.

"THE COURT:  Not with the mother, but with the stepfather, the gentleman who is—

"JUROR NO. 5:  Yeah.  I just found out today that Mr. Vance's stepfather is the father of one of my son's—they were on the baseball together last year.

"THE COURT:  Right.  And I understand that you were introduced and you walked out to the elevator together.

"JUROR NO. 5:  Yeah.  We did not discuss anything about the case, but yes.

"THE COURT:  Mr. Infante, you have some questions?

MR.  INFANTE:  Actually, I have no questions.

"THE COURT:  Mr. Mann.

"MR. MANN:  No.  I'll submit it, Judge.

"THE COURT:  So what I'm going to do—we want to keep this, as I talked about, fair and impartial.  You're shaking your head.  And the relationship, I think, with the contact with your husband and the gentleman as well as your acknowledgement, I think it puts you in a very difficult position.

"JUUOR NO. 5:  Yes.

"THE COURT:  Because some people, you share information and relationships.

"JUROR NO. 5:  Yes.

"THE COURT:  You're acknowledging, and I appreciate that.  I really do.  Unfortunately, I'm going to have to excuse you from this jury.

"JUROR NO. 5:  Okay.  Thank you.

"THE COURT:  It's . . . nothing you did personally.

19

"JUROR NO. 5:  No.

"THE COURT:  And I know that you would do your best, but I know it would be very difficult for you in deliberations.

"JUROR NO. 5:  Yes.

"THE COURT:  Yes, it would be very difficult for you?

"JUROR NO. 5:  Yes.  Well, it wouldn't affect my decision in any way, but, you know, I don't want to affect the outcome of this, you know, after going this far.

"THE COURT:  Sure.  Well, the outside—the extraneous information issues that could come up—I mean, we never know what's going to happen, and we want to prevent that from happening.

"JUROR NO. 5:  All right."

After Juror No. 5 apparently left the courtroom, defense counsel was allowed to "make a record" as follows:

"MR. MANN:  Based upon what Juror No. 5 has just indicated, that there was no discussion about the case between she and Mr. Garris or her husband, and her final statement just now she volunteered that this would not—this contact would not affect my opinion in any way in this case if I was to sit as a juror, I think based upon that—

"THE COURT:  She didn't just say that.  After—she acknowledged that she in fact—the information could in some way have an impact, although she said—she shook her head.  She say, yes, there might be some issues.  She continued to shake her head during the whole course of the discussion.  But go ahead

"MR. MANN:  I heard her differently.  I thought she said it would not affect her ability to be fair, but I—but she understood the Court's rationale.  I think, based upon her responses, that there is no good cause to remove this juror from service at this point, and I would object and argue that that violates Mr. Vance's right to have a jury of his peers, his due process rights in both the state and federal constitution[s], including the 14th Amendment, and I would—if the Court is going to do this, I'm moving for a mistrial at this point.  I think it's—there's insufficient basis to remove this juror and . . . I'll submit it on that basis, Judge.

20

"THE COURT: Mr. Infante.

"MR. INFANTE: I think what we heard just from the juror just now is she acknowledged that she wanted to make sure that this trial was fair, and she also acknowledged that that kind of contact may have some kind of effect on the trial. She said she wanted to make sure everything was fair, we have come this far. So I think she has acknowledged on her own on the record that any kind of contact can lend impropriety to the proceedings. And while she said she could be fair, and acknowledged the more underlying issues that any kind of taint or any kind of hint of impropriety would be improper, and that would actually affect Mr. Vance's rights to a fair trial more than excusing her. And additionally, we do have two alternate jurors who were picked by both Mr. Mann and myself so that Mr. Vance still has a jury of his peers as selected by both the People and the defense, so there would be no violation in that regard.

"THE COURT: Mr. Mann, I think the operative words she said, we've come this far, I don't want to have—cause anything to happen. Her statement is, she found—I found out today that Mr. Vance's stepfather is the father of one of my son's—they were on the baseball team together last year. She knows that this person who's had a relationship—Mr. Vance's stepfather—or not stepfather, but he's—that's what she named him, as the stepfather. That her husband and him and their children have played baseball together. She readily shakes her head yes on everything the Court said as I had the discussion. And, you know, there are two alternates, and I am not going to have this case—based upon the prior conducts we've had in this case, the—even the record that we've had some other witnesses accused Mr. Garris, the gentleman, of contact and calling him a snitch. I'm not certain whether or not that happened the way it happened, but there's enough incidental contacts going on in this case with witnesses and jurors that the Court is not going to take the chance. It's very clear to me that this case could be disturbed by outside influence based upon these contacts and communications that occurred during the course and scope of this trial so far.

"So based upon that, I'm going to deny your motion, Mr. Mann. Your motion for a mistrial is denied. I am going to substitute in—Juror No. 45 will replace Juror No. 5."

21

The change was made and the jury told "not to speculate about the reason" for the change.

"If, at any time, whether before or after the final submission of the case to the jury, a juror . . . upon . . . good cause shown to the court is found to be unable to perform his or her duty, . . . the court may order the juror to be discharged and draw the name of an alternate, who shall then take a place in the jury box . . . ." (Pen. Code, § 1089 (section 1089).) "[A] juror's inability to perform as a juror must be shown as a 'demonstrable reality' [citation], which requires a 'stronger evidentiary showing than mere substantial evidence' [citation]." (*People v. Wilson* (2008) 44 Cal.4th 758, 821.) "The demonstrable reality test entails a more comprehensive and less deferential review. It requires a showing that the court as trier of fact *did* rely on evidence that, in light of the entire record, supports its conclusion that [good cause] was established. It is important to make clear that a reviewing court does not *reweigh* the evidence . . . . Under the demonstrable reality standard, . . . the reviewing court must be confident that the trial court's conclusion is manifestly supported by the evidence on which the court actually relied." (*People v. Barnwell* (2007) 41 Cal.4th 1038, 1052-1053.)

Defendant contends that the trial court's removal of Juror No. 5 cannot satisfy this stringent standard. He argues that the brief exchange between his "mother's boyfriend" and Juror No. 5 fails to establish either actual bias or inability to continue serving. We do not agree.

No one disputes that social interactions or relationships between a juror and a relative of the defendant qualifies as cause for removal under section 1089. (E.g., *People v. Abbott* (1956) 47 Cal.2d 363 [juror worked in same office as defendant's brother, their desks 25 feet apart]; *People v. Taylor* (1961) 189 Cal.App.2d 490 [juror worked with defendant's father for 12 years and lived next door to defendant's sister].) Nor is it controversial that knowledge of such a relationship can become known after trial has commenced. (*People v. Abbott*, *supra*, at p. 370 [juror excused on 11th day of trial].)

A juror's professed willingness to serve impartially can be overcome by behavior and demeanor noted by the trial court. (See *People v. Zamudio* (2008) 43 Cal.4th 327,

22

349; *People v. Lucas* (1995) 12 Cal.4th 415, 489.) Assessment of equivocal or conflicting statements by a juror is usually left to the trial court. (See *People v. Jones* (2012) 54 Cal.4th 1, 43; *People v. Riggs* (2008) 44 Cal.4th 248, 282.) Here, we have conflicting answers from Juror No. 5 as to whether "the contact with your husband and the gentleman . . . puts you in a very difficult position." Twice she said that it would, but then appeared to backtrack with "it wouldn't affect my decision in any way." The trial court was obviously also taking account of body language and demeanor, noting that "She didn't just say that . . . she shook her head . . . . She continued to shake her head during the whole course of the discussion," "She readily shakes her head yes on everything the Court said as I had the discussion." These intangibles are to be accounted in favor the court's decision: "The trial court was in the best position to assess the juror's state of mind, her demeanor, her vocal inflection and other nonverbal cues. 'Even when "[t]he precise wording of the question asked of [the juror] and the answer [she] gave do not by themselves compel [exclusion], the need to defer to the trial court remains because so much may turn on . . . demeanor." ' " (*People v. Wilson, supra,* 44 Cal.4th 758 at p. 780, quoting *Uttecht v. Brown* (2007) 551 U.S. 1, 8.)

Lurking in the background was the fear that any vulnerability or susceptibility would be exploited by the defense. The trial court took pains to avoid a flat accusation of intentional impropriety by Mr. Garris, but it was clearly concerned that, with this second incident, inadvertence was losing credibility ("It's very clear to me that this case could be disturbed by outside influence"). And, of course, we are proceeding on the predicate that the court had already concluded that Juror No. 5's impartiality had been compromised. That conclusion appears as a demonstrable reality.

## DISPOSITION

The judgment of conviction is affirmed.

_____
Richman, J.

We concur:


_____
Kline, P.J.


_____
Haerle, J.